IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:                           :
                                 :
FUNDAMENTAL LONG TERM            :    Case No. 8:11-bk-22258-MGW
CARE, INC.                       :    Chapter 7
                                 :
         Debtor                  :    Adv. No. 8:12-ap-01198-MGW
                                 :    Adv. No. 8:13-ap-00893-MGW
                                 :    Adv. No. 8:13-ap-01007-MGW
- - - - - - - - - - - - - - - :

                                      U.S. Courthouse
                                      801 North Florida Avenue
                                      Tampa, Florida 33602
                                      Held March 19, 2014

TRANSCRIPT OF HEARING

[Re: 8:11-bk-22258]
Third Motion to Compel Production of Documents from
Fundamental Administrative Services, LLC, filed by
Steven M. Berman, Attorney for Trustee (Doc. #1372)

[Re: 8:12-ap-01198]
Motion For Summary Judgment, filed by Seth P. Traub,
Attorney for Trustee on behalf of Plaintiff Beth Ann
Scharrer (Doc. #54); Response to Trustee's Motion for
Summary Judgment, filed by Patrick M. Quinn on behalf of
Defendant Christine Zack (Doc. #76)
*[FULL NATURE OF PROCEEDINGS CONTINUED ON NEXT PAGE]*

BEFORE THE HONORABLE MICHAEL G. WILLIAMSON
UNITED STATES BANKRUPTCY JUDGE

PROCEEDINGS DIGITALLY RECORDED BY COURT PERSONNEL
TRANSCRIPT PRODUCED BY COURT-APPROVED TRANSCRIPTION SERVICE

---

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466

*[FULL NATURE OF PROCEEDINGS CONTINUED FROM PREVIOUS PAGE]*

[Re: 8:13-ap-00893]
1-Plaintiff's Motion for Summary Judgment on Count I for
Substantive Consolidation (Doc. #92); 2-Plaintiff's Motion
& Demand for Jury Trial (Doc. #49); Motion to Determine
Absence of Privilege, and to Compel Production, filed by
Seth P. Traub, Attorney for Trustee on behalf of
Intervenor-Plaintiff Beth Ann Scharrer, Trustee, Plaintiff
Trans Health Management, Inc. (Doc. #129); Objection to
Trustee's Motion for Summary Judgment on Substantive
Consolidation, filed by Jeffrey W. Warren on behalf of
Defendants GTCR Associates VI, GTCR Fund VI, LP, GTCR
Golder Rauner, LLC, GTCR Partners VI, LP, GTCR VI
Executive Fund, LP, Edgar D. Jannotta Jr., THI Holdings,
LLC (Doc. #186); Joint Objection to Trustee's Motion for
Summary Judgment on Count I for Substantive Consolidation,
filed by Gregory M. McCoskey on behalf of Defendants
Murray Forman, Fundamental Administrative Services, LLC,
Fundamental Long Term Care Holdings, LLC, Leonard
Grunstein, THI of Baltimore, Inc. (Doc. #188)

[Re: 8:13-ap-01007]
1-Pretrial Conference; 2-Expedited Motion For Partial
Summary Judgment, filed by Seth P. Traub, Attorney for
Trustee on behalf of Plaintiffs Beth Ann Scharrer, Trans
Health Management, Inc. (Doc. #12); Initial Response filed
by Patricia Redmond on behalf of Defendant Trans
Healthcare, Inc., by and through its Receiver, Alan
Grochal (Doc. #14); Opposition Response by Patricia
Redmond on behalf of Defendant Trans Healthcare, Inc., by
and through its Receiver, Alan Grochal (Doc. #21); 3-
Motion to Dismiss Adversary Proceeding, filed by Patricia
Redmond on behalf of Defendant Trans Healthcare, Inc., by
and through its Receiver, Alan Grochal (Doc, #15)

APPEARANCES:


For the Estate of                   HAROLD CHRISTIAN, Esquire
Alice Darson                        Christian & Davis, LLC
(Appearing by phone)                1007 E. Washington Street
                                    P.O. Box 332
                                    Greenville, SC 29602
                                    864-640-4272


For the Debtor                      BRIAN K. GART, Esquire
(Appearing by phone)                Berger Singerman
                                    350 East Las Olas Boulevard
                                    Suite 1000
                                    Fort Lauderdale, Florida 33301
                                    954-525-9900
                                    bgart@bergersingerman.com


For General Electric                LISA BONANNO, Esquire
Capital Corp.                       Hogan Lovells
(Appearing by phone)                Columbia Square
                                    555 Thirteenth Street, NW
                                    Washington, DC 20004
                                    202-637-5600
                                    lisa.bonanno@hoganlovells.com


For General Electric                CAROL A. LICKO, Esquire
Capital Corp.                       Hogan Lovells US LLP
                                    200 S Biscayne Blvd.
                                    Suite 400
                                    Miami, Florida 33131-5354
                                    305-459-6612
                                    carol.licko@hoganlovells.com


For General Electric                JOEL G. SAMUELS, Esquire
Capital Corp.                       Sidley Austin, LLP
(Appearing by phone)                555 W. Fifth Street
                                    Los Angeles, CA 90013
                                    213-896-6030
                                    jsamuels@sidley.com


For Ventas, Inc. and                DANIEL WEISS, Esquire
Ventas Realty Limited               Jenner & Block, LLP
Partnership                         353 N. Clark Street
(Appearing by phone)                Chicago, Illinois 60654
                                    312-222-9350
                                    dweiss@jenner.com

```
APPEARANCES:
(Continued)

For the Ventas Entities        HUNTER W. CARROLL, Esquire
                               Matthews Eastmoore
                               1777 Main Street
                               Suite 500
                               Sarasota, Florida 34236
                               941-366-8888
                               hcarroll@matthewseastmoore.com

For Christine Zack             PATRICK M. QUINN, Esquire
(Appearing by phone)           Brunner Quinn
                               35 North Fourth Street
                               Suite 200
                               Columbus, Ohio 43215
                               614-241-5550
                               pmq@brunnerlaw.com

For Christine Zack             RICK L. BRUNNER, Esquire
                               Brunner Quinn
                               35 North Fourth Street
                               Suite 200
                               Columbus, Ohio 43215
                               614-241-5550
                               rlb@brunnerlaw.com

For Fundamental Long Term      PAUL V. POSSINGER, Esquire
Care Holdings, LLC,            Proskauer Rose, LLP
Murray Forman and              Three First National Plaza
Len Grunstein                  70 West Madison Street
(Appearing by phone)           Suite 3800
                               Chicago, Illinois 60602
                               312-962-3570
                               ppossinger@proskauer.com

For the GTCR Entities,         JAMES A. STEMPEL, Esquire
THI Holdings, LLC,             Kirkland & Ellis, LLP
and Ned Jannotta               300 North LaSalle
(Appearing by phone)           Chicago, Illinois 60654
                               312-862-312-862
                               james.stempel@kirkland.com
```

APPEARANCES:
(Continued)

For the GTCR Entities,        MATTHEW E. NIRIDER, Esquire
THI Holdings, LLC,            Kirkland & Ellis
and Ned Jannotta             300 North LaSalle
(Appearing by phone)         Chicago, Illinois 60654
                             312-862-2000
                             matt.nirider@kirkland.com


For the GTCR Entities,        JEFFREY W. WARREN, Esquire
THI Holdings, LLC,            Bush Ross, P.A.
and Ned Jannotta             P.O. Box 3913
                             Tampa, Florida 33601
                             813-224-9255
                             jwarren@bushross.com


For the GTCR Entities,        GABOR BALASSA, Esquire
THI Holdings, LLC,            Kirkland & Ellis
and Ned Jannotta             300 North LaSalle
                             Chicago, Illinois 60654
                             312-862-2000
                             gabor.balassa@kirkland.com


For the Receiver,             PATRICIA REDMOND, Esquire
Alan Grochal                  Stearns Weaver, et al
                             150 W. Flagler Street
                             Suite 2200
                             Miami, Florida 33130
                             305-789-3553
                             predmond@stearnsweaver.com


For the Ch. 7 Trustee         STEVEN M. BERMAN, Esquire
Beth Ann Scharrer             SETH P. TRAUB, Esquire
                             Shumaker, Loop & Kendrick
                             101 E. Kennedy Blvd.
                             Suite 2800
                             Tampa, Florida 33602
                             813-229-7600
                             straub@slk-law.com
                             sberman@slk-law.com

APPEARANCES:
(Continued)

For the Probate Estates          DANIEL R. FOGARTY, Esquire
                                 Stichter Riedel
                                 110 E. Madison St., Suite 200
                                 Tampa, Florida 33602
                                 813-229-0144
                                 dfogarty@srbp.com


For the Probate Estates          ISAAC RUIZ-CARUS, Esquire
                                 Wilkes & McHugh, P.A.
                                 One North Dale Mabry Hwy.
                                 Suite 800
                                 Tampa, Florida 33609
                                 813-873-0026
                                 iruiz-carus@wilkesmchugh.com


For Fundamental                  GREGORY M. MCCOSKEY, Esquire
Administrative Services          Akerman Senterfitt
and THI of Baltimore, Inc.       401 E. Jackson Street
                                 Suite 1700
                                 Tampa, Florida 33602
                                 813-223-7333
                                 greg.mccoskey@akerman.com


For Rubin Schron                 KATHERINE WYMAN, Esquire
(Appearing by phone)             Dechert, LLP
                                 200 Clarendon Street
                                 Boston, Massachusetts 02116
                                 617-728-7100
                                 katherine.wyman@dechert.com


For Rubin Schron                 JOSEPH H. VARNER, III, Esq.
                                 Holland & Knight LLP
                                 P.O. Box 1288
                                 Tampa, Florida 33601
                                 813-227-6703
                                 joe.varner@hklaw.com

APPEARANCES:
(Continued)

For Quintairos Defendants          MARJORIE S. HENSEL, Esquire
                                   Hinshaw & Culbertson LLP
                                   100 S. Ashley Drive
                                   Suite 500
                                   Tampa, Florida 33602-5301
                                   813-276-1662
                                   mhensel@hinshawlaw.com


For Kristi Anderson                STEVEN N. LEITESS, Esquire
(Appearing by phone)               Leitess Friedberg, PC
                                   One Corporate Center
                                   10451 Mill Run Circle
                                   Suite 1000
                                   Baltimore, Maryland 21117
                                   410-581-7400
                                   steven.leitess@lf-pc.com


Also present                       Beth Ann Scharrer
                                   Alan Grochal

1                    P R O C E E D I N G S

2              (Proceedings commenced at 1:31 p.m.)

3              COURTROOM CLERK:  All rise.  This Honorable Court

4    is again in session.

5              THE COURT:  Please be seated.

6              COURTROOM CLERK:  Case No. 11-22258, Fundamental

7    Long Term Care, Incorporated.  And we have Adversary 13-1007,

8    Adversary No. 13-893 and Adversary 12-1198.  Judge, we have a

9    long list of telephonic appearances.

10             THE COURT:  Yes.  Let me go through the list of

11   people who have prearranged to appear by phone.  I'll call

12   your name.  Please identify yourself and your client.  Harold

13   Christian.

14             MR. CHRISTIAN:  Yes.  This is Harold Christian for

15   the estate of Alice Darson.

16             THE COURT:  Okay, thank you, Mr. Christian.  Lisa

17   Bonanno?

18             MS. BONANNO:  Yes.  This is Lisa Bonanno and I'm

19   here for GECC.

20             THE COURT:  Thank you, Ms. Bonanno.  Paul

21   Possinger?

22             MR. POSSINGER:  Good afternoon, Your Honor.

23   Paul Possinger for Murray Foreman, Len Grunstein and

24   Fundamental Long Term Care Holdings, LLC.  And for the

25   Court's information, FLTCH has changed its name, effective

1    March 6th, to Hunt Valley Holdings, LLC.

2            THE COURT:  Okay.  Thank you.  And I noticed that

3    you filed a notice of name change in the file.  You'll need

4    to go ahead and supplement that with whatever the document

5    is.  It's just an internal procedure.  We don't do name

6    changes just based on a notice; we have something reflecting

7    how that happened.  If you don't mind --

8            MR. POSSINGER:  Yes, we'll do, Your Honor.

9            THE COURT:  Okay.  Patrick Quinn.

10           MR. QUINN:  Good afternoon, Your Honor.  Patrick

11   Quinn on behalf of Christine Zack.

12           THE COURT:  Thank you.  James Stempel?

13           MR. STEMPEL:  Good afternoon, Your Honor.  James

14   Stempel on behalf of THI Holdings, LLC, GTCR entities and Ned

15   Jannotta.

16           THE COURT:  Okay.  Thank you, Mr. Stempel.  Matthew

17   Nirider?

18           MR. NIRIDER:  Yes.  Good afternoon, Your Honor.

19   Matthew Nirider also for THI Holdings, the GTCR entities and

20   Ned Jannotta.

21           THE COURT:  Okay.  Thank you.  Joel Samuels?

22           MR. SAMUELS:  Yes.  Good afternoon, Your Honor.

23   Joel Samuels of Sidley Austin on behalf of GECC.

24           THE COURT:  Thank you, Mr. Samuels.  Brian Gart.

25           MR. GART:  Yes.  Good afternoon, Your Honor.  Brian

1   Gart of Berger Singerman on behalf of the Debtor.

2            THE COURT:  Thank you, Mr. Gart.  Dan Weiss?

3            MR. WEISS:  Yes, Your Honor.  Dan Weiss here for

4   Ventas, Inc. and Ventas Realty Limited Partnership.  Thank

5   you.

6            THE COURT:  Okay.  And, finally, Katherine Wyman?

7            MS. WYMAN:  Good afternoon, Your Honor.  This is

8   Katherine Wyman appearing on behalf of Rubin Schron.  Thank

9   you.

10           THE COURT:  Thank you, Mr. Wyman.  Now, let me

11  take appearances of those appearing here in the courtroom.

12           MR. BERMAN:  Good afternoon, Your Honor.  Steve

13  Berman and Seth Traub appearing on behalf of Beth Ann

14  Scharrer, the Chapter 7 Trustee for the estate of Fundamental

15  Long Term Care, Inc., including Trans Health Management, Inc.

16  And Ms. Scharrer is also here making her appearance.

17           THE COURT:  Thank you.

18           MS. REDMOND:  Good afternoon, Your Honor.  Patricia

19  Redmond, Stearns Weaver Miller, appearing on behalf of Alan

20  Grochal, the Receiver for the Maryland Receivership.

21  Mr. Grochal is also in the courtroom.

22           THE COURT:  Thank you, Ms. Redmond.

23           MR. RUIZ-CARUS:  Good afternoon, Your Honor.  Isaac

24  Ruiz-Carus on behalf of the various probate estates.

25           MR. WARREN:  Good afternoon, Your Honor.  Jeffrey

1   Warren, and Gabor Balassa is with me with the Kirkland firm.

2   We're here on behalf of the GTCR entities, Mr. Jannotta and

3   THI Holdings.

4               THE COURT:  Okay.  Thank you, Mr. Warren and Mr.

5   Balassa.

6               MR. FOGARTY:  Good afternoon, Your Honor.  Daniel

7   Fogarty, also on behalf of probate estates.

8               THE COURT:  Thank you, Mr. Fogarty.

9               MS. LICKO:  Good afternoon, Your Honor.  Carol

10  Licko of Hogan and Lovells, on behalf of General Electric

11  Capital Corp.

12              THE COURT:  Okay, Ms. Licko.  Thank you.

13              MR. BRUNNER:  Good afternoon, Your Honor.  Rick

14  Brunner on behalf of Christine Zack.

15              THE COURT:  Thank you, Mr. Brunner.

16              MR. CARROLL:  Good afternoon, Your Honor.  Hunter

17  Carroll of Matthews Eastmoore on behalf of the Ventas

18  Entities.

19              THE COURT:  Okay.  Thank you, Mr. Carroll.

20              MR. HENSEL:  Marjorie Hensel on behalf of the

21  Quintairos Defendants.

22              THE COURT:  Okay, Ms. Hensel.  Thank you.

23              MR. MCCOSKEY:  Your Honor, good afternoon.  Greg

24  McCoskey on behalf of Fundamental Administrative Services,

25  LLC and THI of Baltimore, Inc.

1          THE COURT:  Thank you, Mr. McCoskey.

2          MR. VARNER:  Good afternoon, Judge Williamson.

3    Joe Varner for Rubin Schron.

4          THE COURT:  Okay, Mr. Varner.  Thank you.  Very

5    well, the Court has several matters on the calendar.  Let me

6    inquire of the parties, if there's any prearranged way in

7    which to proceed, other than that which is set forth in the

8    calendar.  I'm happy to proceed in any fashion.  We do have

9    time --

10         MR. LEITESS:  Your Honor, there is one more --

11   there is one more entry of appearance by telephone.  I

12   apologize for cutting in.  This is Steven Leitess for

13   Kristi Anderson.

14         THE COURT:  Okay.  Thank you, Mr. Leitess.  So

15   noted.  Anybody else?

16         (No response.)

17         THE COURT:  Okay.  We can go in the order in the

18   calendar or whatever other order that you all think would

19   make more sense.  If things are going to be broken into

20   blocks in any fashion, we can discuss that, and then I'll

21   need to know who's going to be arguing and how much time you

22   need so we can efficiently manage our time.

23         MR. BERMAN:  Your Honor, Steve Berman.  May I be

24   heard?

25         THE COURT:  You may.

1          MR. BERMAN:  I would suggest we tackle the

2   substantive consolidation motion for summary judgment.  It

3   seems to be the weightiest of issues and maybe one of the

4   more important issues today.

5          I think we can probably get through the items on

6   calendar, but I would suggest we take the motion for summary

7   judgment on substantive consolidation in the adversary

8   proceeding.  I think there were four objections to that

9   motion for summary judgment.  Those could be handled in a

10  block.

11         And then my next suggestion is to take the

12  motion for summary judgment in the indemnification adversary

13  proceeding against Mr. Grochal's Receivership entity, THI.

14  I think there is both a motion for summary judgment that we

15  filed, as well as a motion to dismiss in that adversary

16  proceeding.

17         And then my suggestion after that is to handle the

18  discovery-related matters.  There are -- there's a motion

19  directed to Fundamental Administrative Services, a third

20  motion to compel.  That could be handled in this sort of

21  third tier along with the GTCR-related motions.

22         We filed a motion to determine certain documents

23  are not privileged.  They filed a motion to enforce some sort

24  of clawback rights that they assert exist.  Those could be

25  handled along with other discovery matters.  There is one not

1    calendar discovery item, that will take just a couple of

2    minutes, on depositions.

3            And then finally, at the end of the calendar,

4    I would suggest the Zack adversary proceeding.  We have a

5    pending motion for summary judgment.  There were opposition

6    papers filed recently in that one.  I think if we can get to

7    it, that would be great.  If we didn't get to it today, that

8    probably wouldn't alter the complexion of the case very much,

9    if that had to roll to another day.

10            As far as -- well, if you're going to address

11   order, I can tell you afterwards how much time that I think

12   we need for argument.

13            THE COURT:  Okay.  Let's do order first.

14            MS. REDMOND:  Your Honor, I have no objection to

15   the order except that when Mr. Berman said the motion for

16   summary judgment in the indemnification adversary --

17            THE COURT:  And your motion to dismiss.

18            MS. REDMOND:  -- you had indicated earlier that the

19   motion to dismiss would be heard first.  There may be some

20   preliminary issues also before summary judgment, as there's

21   not been an answer filed or any other pleading filed in the

22   case.

23            THE COURT:  Right.  Why don't we hear -- we can

24   lead off with the motion to dismiss if you want to go first,

25   but then why don't we do both.

1          MS. REDMOND:  Your Honor, that will be fine.  And

2    a lot of the issues will cross over between both.

3          THE COURT:  Right.  So we'll do consolidated

4    hearings.  Let me mention also, by way of disclosure.

5    I've had two requests -- one by me and one by a party --

6    for something that has nothing to do with this case, but

7    I want to disclose it.

8          Mr. Ruiz-Carus is going -- is petitioning to be a

9    member of a Bar in another state and Mr. Riedel asked if I

10   would swear him in.  Of course, I do that all the time; be

11   happy to do it.  I have the papers in my chambers and I want

12   to do that.  I want to let you all know that I'm swearing him

13   in, unless someone has an objection.

14         Also, Ms. Redmond is a professor of Bankruptcy Law.

15   I'm a new professor, and at a CLE conference we discussed my

16   clients and she volunteered to give me some old exams.  And

17   so, if anybody thinks that's inappropriate.  It would be a

18   great assistance to me because I've never written -- I didn't

19   do very well on most of them but, I've certainly never

20   written one.

21         MR. BERMAN:  As long as the answer key doesn't

22   resolve any pending issues in this case, we don't have a

23   problem.

24         THE COURT:  We don't do a privilege log, I can

25   assure you.  So I just wanted to disclose those things.  And

1     if anybody has any problem at all with either of those

2     things, please bring it to the attention of chambers and we

3     can -- we can move on without it, so -- okay?

4               MS. REDMOND:  Thank you, Your Honor.

5               MR. BERMAN:  No objections obviously from us, Your

6     Honor.

7               THE COURT:  Okay.  So the order -- Ms. Redmond, the

8     substantive consolidation, it's okay to go first with.  You

9     just wanted the indemnification --

10              MS. REDMOND:  Yes, Your Honor.  I just wanted to

11    flip the order on the motion for summary judgment on the

12    indemnification versus motion to dismiss.

13              THE COURT:  That's fine.  You can go first on the

14    motion to dismiss, but I'd just like you to cover both if you

15    could.

16              MS. REDMOND:  Thank you, Your Honor.

17              THE COURT:  Okay.  Okay, then, we'll go to the

18    substantive consolidation.  Mr. Berman, you'll be presenting,

19    I take it, for the Plaintiff?  Or not?

20              MR. BERMAN:  I will, Your Honor.  It may very

21    well be -- I think we're the movant on -- or the complainant

22    on that count, even though it's part of the consolidated

23    adversary proceeding that we filed jointly with the

24    Plaintiffs.

25              So I think the primary presentation will be me,

1    but I don't want to foreclose the creditors from having an

2    opportunity to be heard.  Obviously, one of the paramount

3    interests in a substantive consolidation analysis is what the

4    creditors want and how they are affected in this process.

5              And certainly Mr. Christian, who's appearing

6    telephonically on behalf of one of the tort creditors, and

7    Mr. Ruiz-Carus, who's appearing on behalf of the other six

8    tort creditors, should certainly have the opportunity to be

9    heard.  And if the Court has questions of them, they're

10   available.

11             But from our side, I suspect on the motion for

12   substantive consolidation, I can make my presentation within

13   about 30 minutes.  I don't want to foreclose the opportunity

14   from the other folks.  If the Court needs me to shorten that,

15   I could possibly do that at the Court's suggestion.

16             THE COURT:  It would be ideal if we could do your

17   whole side in 30 minutes and then carve out two to three

18   minutes for Mr. Ruiz-Carus or Mr. Christian, if that's

19   acceptable.  Mr. Ruiz-Carus?

20             MR. RUIZ-CARUS:  That's fine, Your Honor.

21             THE COURT:  That's fine, he says.  And Mr.

22   Christian?

23             MR. CHRISTIAN:  Yes, sir.  That would be fine, Your

24   Honor.

25             THE COURT:  Okay.  So why don't you --

```
 1              MR. CHRISTIAN:  This is Harold Christian.
 2              THE COURT:  -- just save them a --
 3              MR. BERMAN:  I'll take 25 and then yield five to
 4    the other side.  And if that gives me a couple of minutes for
 5    quick rebuttal points --
 6              THE COURT:  That's fine.
 7              MR. BERMAN:  -- that's great.
 8              THE COURT:  Okay.  Is that -- Ms. Redmond, are you
 9    going to be taking the lead on the other side of this one?
10              MS. REDMOND:  No, Your Honor.  I'm one of the four
11    people, but not taking the lead on this one.
12              THE COURT:  Okay.  Mr. McCoskey?
13              MR. MCCOSKEY:  Your Honor, I don't know that there
14    is a lead response as opposed to separate responses that have
15    been filed on a number of different bases.
16              THE COURT:  Right.
17              MR. MCCOSKEY:  I do believe this issue has been
18    at the forefront of this case for almost two years now.
19    It's an important issue.  For myself, I'd like to have 15
20    minutes.  We've not had an opportunity to coordinate times,
21    and potentially I may address arguments that others would
22    highlight and may want to follow on.  I simply don't have an
23    organized schedule for the Court, and I apologize.
24              THE COURT:  That's fine.  Why don't we tentatively
25    say you'll go first for 15 and let's see how it falls in.
```

1  Who else would like to be heard on the substantive

2  consolidation.

3          MS. REDMOND:  Your Honor, I would like to be heard.

4  I don't think it will take me more than five to seven

5  minutes.

6          THE COURT:  Okay.  And Mr. --

7          MR. BALASSA:  Balassa, Your Honor.

8          THE COURT:  Balassa, that's right.

9          MR. BALASSA:  The GTCR entities, Holdings, and

10 Mr. Jannotta have limited objections that I think we could

11 address in three or four minutes.

12         THE COURT:  Okay.  So five minutes.

13         MR. GART:  And, Your Honor, this is Brian Gart for

14 the Debtor.  I'm going to say no more than three minutes.

15         THE COURT:  Okay.  We'll give you five.

16         MR. GART:  Thank you, Your Honor.

17         THE COURT:  So, let's see.  That's 35 minutes.

18 Anybody else?

19         (No response.)

20         THE COURT:  Okay.  Well, that works.  And then, so

21 we'll just give you 30 minutes, Mr. Berman, and give the five

22 minutes up to your -- the parties that are aligned with you,

23 Mr. Ruiz-Carus and Mr. Christian.

24         MR. BERMAN:  Thank you, Your Honor.  And if I can

25 request -- and I know this is an additional burden -- but if

```
 1   I can request you to sort of give me the hand at 25 and I'll
 2   reserve five for rebuttal if that's acceptable to the Court.
 3            THE COURT:  Yes, I'd be happy to do that.
 4            MR. BERMAN:  And, Your Honor, before I get started
 5   and before my time starts, may I approach?
 6            THE COURT:  You may.
 7            MR. BERMAN:  I have a binder that's entitled
 8   Evidence.  These are documents that have been filed in
 9   support of the motion for summary judgment on substantive
10   consolidation.
11            THE COURT:  Okay.
12            MR. BERMAN:  It's all record evidence.
13            THE COURT:  Why don't you bring that on up?
14            MR. BERMAN:  And I have copies for opposing
15   parties.  May I approach?
16            THE COURT:  Yes, you may.  (Court confering with
17   courtroom clerk.)
18            (Documents presented to Court and counsel.)
19            MR. BERMAN:  And I don't have evidence tags.
20   This is obviously not an evidentiary hearing.
21            THE COURT:  I understand.
22            MR. BERMAN:  But that is evidence that was
23   submitted and I thought it'd be easy if it was in paper
24   form in front of the Court.
25            THE COURT:  These are probably the exhibits that
```

1   you had to your complaint.

2         MR. BERMAN:  They are, Your Honor.  And I'll point

3   out to folks, the index that's in each of the notebooks has

4   things lettered A through L even though the documents are

5   actually numbered in the filing, which is the appendix we

6   filed at Tab 93, but they go in the same chronological order.

7   And we started writing in numbers next to the letters so that

8   it would be easier for folks to follow along.  I don't know

9   how far we got on that process.  But I'm ready to begin

10  whenever the Court is.

11        THE COURT:  Okay.  It's 1:46.  You may start,

12  and I'll give you a signal in 25 minutes.

13        MR. BERMAN:  Thank you, Your Honor.  May it

14  please the Court.  We're here on a motion for substantive

15  consolidation.  The Court's familiar with the history, but

16  I'll give a brief recap.  We obviously have had a bit of a

17  tug of war over control of the subsidiary of the Debtor,

18  Trans Health Management, Inc., since March of 2012.  We

19  got involved in May of 2012, our law firm did.

20        You resolved the control issues, I believe,

21  on October 9, 2012, and there were continued attacks on

22  jurisdiction and control of that subsidiary in a number of

23  different ways -- discovery ways.  The settlement that was

24  reached with the creditors was attacked; disqualification

25  motions were filed against my firm and myself.

 1          And Judge Moody remanded to you the issue in two

 2  forms, sort of the issue that you raised with the parties

 3  before Judge Moody raised it.  And that is, how we treat this

 4  nondebtor subsidiary part of the estate.  Certainly its stock

 5  ownership is property of the estate, but how far beyond that

 6  do you go?  Can THMI pursue causes of action in its own name

 7  through the Trustee, through -- in this court, in state

 8  court, federal court?  Those were sort of the hanging issues.

 9          And you brought the parties back before you in the

10  middle of our 2004 discovery and directed all of the parties

11  to file whatever claims they have against each other.  And

12  the one you asked us to file, in addition to whatever claims

13  people had, was one to determine this issue of the role of

14  the subsidiary.  And we chose to file that.  No one else

15  filed a count on that issue in the form of a substantive

16  consolidation count.

17          Although motions to dismiss were filed by nearly

18  all of the Defendants, if not all of the Defendants, in those

19  various adversary proceedings, there were no motions to

20  dismiss the substantive consolidation count.

21          Remarkably, if you look at the motions to dismiss

22  in various notations and footnotes, the parties who moved to

23  dismiss the other counts affirmatively stated that they

24  weren't interested parties in the consolidation issues.

25  They didn't have a stake in that fight and they weren't

1   responding.

2           They didn't move to dismiss that count.  That count

3   has not been answered by anyone in the adversary proceeding

4   although now we see four oppositions to the motion to

5   dismiss.  And that's what brought us here.

6           As a threshold matter, there were challenges in

7   these recent opposition papers to due process and notice.

8   And I'd cite the Court to the S & G Financial Services of

9   South Florida case.  It's instructive.  You can find it at

10  451 B.R. pages 573, and in particular on page 585.  And the

11  Southern District talked about -- the Bankruptcy Court

12  talked about notice needs to be provided to all creditors and

13  creditors need to have an opportunity to be heard.  But the

14  form of notice just needs to be handled in a manner that's

15  likely to reach its intended audience.

16          In this case, the folks who are opposing the motion

17  for summary judgment on substantive consolidation, all of

18  them were parties in the adversary proceeding, save one,

19  and that's Alan Grochal.  And he's now intervened in the

20  adversary proceeding to participate in the summary judgment

21  hearing.

22          The creditors in this case -- there are nine

23  creditors who filed the claims.  The six Wilkes creditors,

24  they're represented here; they obviously know what's going

25  on.  Mr. Christian's client, that's the estate of, I think

1  it's, Grace Alice Darson (sic-Alice Elizabeth Greene Darson),

2  she's Claim No. 7.

3        And then there were two other claims filed that are

4  non-tort claims, and I sort of call them placeholder claims

5  because they don't articulate, in our view, a very clear view

6  of their claim for relief against the Debtor or against THMI.

7  And those claims were from Fundamental Clinical Consulting

8  and from Mr. Grochal.  But all of the parties are here.

9        There was also a citation to a Judge Paskay

10  decision for the proposition in Alico Mining that you have

11  to have an evidentiary hearing to determine substantive

12  consolidation.  I don't think that's a fair reading of Alico

13  Mining.  In Alico Judge Paskay thought he needed to hear

14  evidence in an evidentiary hearing.  That's obviously not

15  a requirement under the Eleventh Circuit case law.

16        If there's a dispute of fact, then you can set

17  an evidentiary hearing, but we don't believe there's any

18  disputed facts with respect to the facts upon which we rely

19  to obtain substantive consolidation.

20        Additionally, Your Honor, I'll point out that

21  Fundamental Administrative Services, in their complaint at

22  Adversary Proceeding 13-929, that's Docket 1, paragraphs 151

23  through 153 of Fundamental Administrate Services' complaint,

24  adversary complaint, asserts that all the litigation claims

25  against THMI identified in the THMI stock purchase agreement

1  -- which is in your notebook at Tab A, which is Exhibit No. 1

2  or Exhibit 1 to the Appendix Tab A in the notebook -- the

3  Schedule 5H of the THMI creditors, according to FAS, all of

4  those claims have been resolved other than the claims that

5  have been filed in this case.

6         Additionally, Fundamental Long Term Care Holdings,

7  Mr. Possinger's client, asserts that they're a creditor of

8  THMI and their assertion is that they loaned money to the

9  Debtor, $100,000 to the Debtor, for the Debtor to buy THMI.

10  And they, through Trans Health of Baltimore, paid themselves

11  back some $65,000 out of the $100,000 from THMI's bank

12  account.  They still assert that they're a creditor and

13  they are obviously here and represented in this case.

14         So my point in all of that is that folks have had

15  notice.  There is due process that's been afforded.  This is

16  an issue that's been before this Court for a long time and I

17  don't think anyone can claim that this is a newly-raised

18  issue for which they're unprepared.

19         Substantively, the standard for substantive

20  consolidation is set forth in the Eleventh Circuit Eastgroup

21  case.  Basically it's a two-prong test.  And the movant, or

22  complainant here, needs to satisfy a two-prong test that,

23  first, there's a substantial identity between the entities to

24  be consolidated.  And second, that consolidation (a) is

25  necessary to avoid a harm or (b) will realize some benefit.

1   Pretty broad standard.

2          And the Eastgroup factors, I'll walk through

3   in just a moment.  They're a nonexclusive list; it's an

4   equitable determination.  The Court has to sort of take

5   everything into account and then make a judgment call on

6   whether or not the Eastgroup two-prong test is met.

7          Interestingly, after the two-prong test is met

8   by the movant or the complainant, the burden of persuasion

9   shifts to the opponents or the objecting creditors.  And the

10  creditors then have to establish that (a) they relied on a

11  separate credit of one of the entities to be consolidated

12  and (b) that they would be prejudiced by substantive

13  consolidation.

14         We all know that there's a split of authority

15  within this state.  Judge Jennemann and Judge Funk have three

16  published opinions now, collectively between the two of them,

17  that stand for the proposition that you cannot substantively

18  consolidate a nondebtor into a debtor, and those are cases

19  that were cited by the opposition papers.

20         Judge Paskay and Judge Isicoff take the contrary

21  position, the position we're advancing, that you can.  And we

22  would argue Judge Paskay's position in Alico Mining and Judge

23  Isicoff's position in S & G Financial Services is the more

24  reason to approach.  It's an equitable determination both to

25  solve the substantial identity issue and to avoid harm or

1    realize benefit.

2           And those needs and goals don't stop necessarily at

3    the edge of a petition filing.  And I think that's the policy

4    reason behind the better-reasoned approach to allow for

5    consolidation of nondebtors into debtors.

6           Judge Paskay talked about in the <u>Murray Industries</u>

7    decision in 1990, in cases where substantive consolidation

8    are appropriate there's no real formula to analyze the cases.

9    Obviously the <u>Eastgroup</u> decision, which came a year later,

10   gives some guidance in that regard.  But even <u>Eastgroup</u>

11   doesn't say that there's an exclusive list.

12          So in <u>Eastgroup</u>, the factors are the degree of

13   difficulty in segregating and ascertaining individual assets

14   and liabilities.  That's the first one.  The second one is

15   the presence or absence of consolidated financial statements.

16   The third is profitability of consolidation at a single

17   location.  The fourth is comingling of assets in business

18   functions.  Five, unity of interest and ownership between

19   the various entities.  Six, existence of parent and inter-

20   corporate guaranties on loans.  And seven, transfer of assets

21   without formal observance of corporate formalities.

22          Some additional factors that haven't been addressed

23   in the <u>Eastgroup</u> citing <u>Murray Industries</u> and the <u>Holywell</u>

24   decision from the Southern District of Florida include parent

25   owning the majority of the subsidiary stock, entities having

1   common officers or directors, subsidiary being grossly

2   undercapitalized, and the subsidiary transacting business

3   only with the parent and, finally, both entities sort of

4   disregarding the legal requirements.

5        Well, what are the facts?  I think these facts are

6   all undisputed.  First, the creation of the Debtor entity we

7   now know was formed by the Troutman Sanders law firm.  I took

8   Brett Baker's deposition -- I've lost track of time -- I

9   think it was last week.  And he's the transactional lawyer

10  who did it.  He was directed by Murray Forman to create

11  Fundamental Long Term Care, Inc.  And the stock purchase

12  agreement was negotiated on the seller's side by the Kirkland

13  and Ellis firm and on the buyer's side by the Troutman

14  Sanders law firm.

15       The Debtor is an inactive Delaware corporation.

16  The Debtor -- and I can -- if the Court has questions, I can

17  give citations, but I'm trying to run through this so that

18  the Court can get a flavor.

19       The Debtor holds 100 percent of the equity interest

20  in the subsidiary.  Before March of 2006, THMI was a wholly-

21  owned subsidiary of Trans Healthcare, Inc.  That's Mr.

22  Grochal's company in Receivership, and the sub-sub company

23  under the Trans THI Holdings entity.

24       THMI provided the management services for up to 170

25  nursing homes or acute care facilities between 2003 and 2006.

1    And then in March of 2006, on March 28th, everything stopped.

2    The employees who were doing the work at Trans Health

3    Management, Inc. began doing their work at THI of Baltimore

4    Management, a wholly-owned sub of THI of Baltimore, which

5    was a company that was taken into and purchased by FLTCH, by

6    Mr. Possinger's client.  And all that happened overnight,

7    literally.

8            The employees who went over, the large group of

9    employees, nearly 200, went over to -- and I say went over;

10   they stayed in their same offices with their same computers

11   and equipment and moved around within the office complex

12   eventually, but stayed in essentially the same place.

13           FLTCI was incorporated a couple of months before

14   the stock sale.  They share the same physical address at the

15   Sparks, Maryland Business Complex as does THMI.  And the sole

16   shareholder of the Debtor is ostensibly Barry Saacks.  And we

17   know about Barry Saacks.  He's an older graphic artist who

18   lives in a nursing home now.

19           Barry Saacks was listed as the president of FLTCI

20   and the president of the subsidiary, THMI, in the stock

21   purchase agreement, although Mr. Saacks didn't realize he

22   had formed a corporation to buy another corporation, didn't

23   realize he had purchased anything, didn't have any money to

24   purchase anything. Had a recollection of someone coming to

25   him in 2006 talking about a business proposition but, as he

 1    described it, the light went out in the room and he didn't

 2    hear anything for years.

 3          He heard something in 2012 once the involuntary

 4    petition was filed and then things geared back up again.  But

 5    according to Mr. Saacks, he doesn't know that he's an owner

 6    of a corporation that owns the subsidiary corporation.

 7          You can draw whatever inferences you want.  I think

 8    the evidence is coming out that the concept here was to take

 9    the nursing home entity assets that had continued viability

10    value and park them in one set of entities, and take the THMI

11    operating entity that had, and was subject to, a substantial

12    amount of nursing home claims and sort of dead end it, as

13    long as the employees and the operations could be safely

14    housed in a newly-created entity.

15          Well, where does that leave us with FLTCI and THMI?

16    Well, Mr. Saacks didn't observe any corporate formalities,

17    couldn't have because he didn't know he owned a corporation.

18    In fact, the undisputed evidence is that nothing was paid by

19    Mr. Saacks for this stock.

20          The other company, FLTCH's purchase of THI of

21    Baltimore which then created THI of Baltimore Management to

22    take over the THMI management functions -- that FLTCH entity

23    is who funded the $100,000.

24          Mr. Backenroth, who was appointed supposedly

25    pursuant to a power of attorney that he received from Mr.

1    Saacks in 2012 after the involuntary was filed, testified

2    that FLTCI, the Debtor, was, in his words, merely a holding

3    company; not going to be engaged in any activity and had no

4    books and records.

5         Mr. Backenroth testified that FLTCI was not,

6    and was never intended to be, an operating business; it

7    had no bank account; it prepared no balance sheets, income

8    statements or other financial records; had no officers,

9    directors, or employees other than Mr. Saacks.  Mr. Saacks

10   was also the sole officer and director of THMI.

11        Neither FLTCI nor THMI, according to Mr.

12   Backenroth, had any business operations separate and apart

13   from each other.  Mr. Backenroth described the relationship

14   as a little mom-and-pop operation trying to make some money

15   out of some hardware and software.

16        Mr. Backenroth was a little offended with the

17   question about observation of corporate formalities and

18   he said, "What formalities a little mom-and-pop operation

19   requires, you can make whatever hay you want out of it, it's

20   ridiculous.  It's a little mom-and-pop company.  What do you

21   expect they have?"

22        Well, they didn't have anything.  They didn't

23   have any corporate observance; they didn't have any books and

24   records; they didn't have any bank accounts; they didn't have

25   any operations, employees, nothing.  They didn't even pay

1   their corporate filing fees with the State of Delaware

2   because it wasn't intended to be a real relationship.

3        I already talked about the funding came from FLTCH.

4   And although it does appear the stock was transferred, we got

5   the closing binder which, interestingly enough, had never

6   been delivered to Mr. Saacks.  The closing binder was still

7   at the Troutman Sanders law firm last week when I deposed the

8   corporate lawyers.  I think that's another factor in favor of

9   consolidation.

10       And I think Mr. Baker's testimony is significant.

11  And this will be the subject of another motion to compel

12  because privileges were asserted.  But what came out in

13  Mr. Baker's deposition was Mr. Saacks came to the Troutman

14  Sanders law firm and, in Mr. Baker's own words, came in a

15  disheveled appearance and had hygiene issues, according to

16  Mr. Baker, and that caused him concern.  Not the type of

17  buyer of a corporation that you would expect, under these

18  circumstances.

19       Mr. Baker then testified that there was some

20  interaction between Leonard Grunstein and Mr. Saacks in the

21  closing conference room that caused Mr. Baker great concern.

22  Although Mr. Baker wasn't there, he received a report from

23  the associate who was sent to supervise the execution of the

24  corporate documents.  And when asked what really happened

25  between Mr. Grunstein and Mr. Saacks, privileges were

1   asserted even though we were talking about the closing on

2   the Debtor's subsidiary corporation.

3         Mr. Saacks was so concerned -- or, I'm sorry.

4   Mr. Baker was so concerned with the dynamic of that closing,

5   that he approached two senior partners and complained -- or

6   confided in them, from an ethical perspective.  When asked

7   what they discussed, I was told that was privileged even

8   though we're talking about the Debtor's purchase of its

9   subsidiary.

10        And finally, Mr. Baker was told not to worry about

11  the transaction; that it would move forward.  But he was so

12  concerned ethically, presumably, that he sent himself, to his

13  personal email address, a memo detailing his concerns and the

14  content of his conversations.  We've asked for a copy of that

15  email and have not received it.  Those issues will be the

16  subject of further motion practice.

17        But the record evidence which is before the Court

18  today for this motion for summary judgment also confirms that

19  this was not a legitimate transaction, a real transaction for

20  the purchase of a nursing home operating business.

21        Further record evidence reflects that on March

22  28th, although many of the employees sort of switched

23  employers, officers and directors resigned their positions.

24  This is at Tab F in the notebook.  Officers resigned their

25  positions some three months after the closing which is

1 peculiar.

2 　　　　　Testimony of the former THMI employees in the

3 accounting department were that bills continued to be paid

4 out of the THMI collections and bank accounts.  Evidence

5 reflects that over a million and a half dollars of bonuses

6 were paid on March 28th to the THMI employees out of the

7 available cash that THMI had in its bank accounts.

8 　　　　　And finally, some three months after the closing,

9 somehow THI of Baltimore secured repayment of its loan out

10 of the THMI bank accounts.  That's reflected in the record

11 evidence and some $35,000 was transferred to THIB which

12 removed all of THMI's available cash and retired a portion

13 of that $100,000 advance that THIB made.

14 　　　　　Similarly, Mr. Backenroth testified that once

15 THMI was sold to the Debtor, it had no purpose to operate a

16 business and all the remaining property in the company was

17 hardware and software.  And we now know that equipment

18 stayed onsite and continued to be used by THI of Baltimore

19 Management which is -- has gone through a number of name

20 changes but primarily does business under the Fundamental

21 Administrative Services moniker.

22 　　　　　Legal argument, Your Honor.  The applicable

23 factors:  Degree of difficulty in segregating and

24 ascertaining individual assets and liability.  You can't

25 tell a difference.  The Debtor is just a holding company.

 1  The subsidiary was the real operating company.  They've

 2  obviously comingled whatever they had.

 3          And the causes of action between the Debtor and

 4  THMI against third parties are really all that exist in

 5  the estate at this point in time.  And it is difficult to

 6  separate who's going to be the Plaintiff.  Presumably, if I

 7  filed a lawsuit in the name of the Debtor, I would get

 8  motions to dismiss saying they're not the real party in

 9  interest; THMI is.  If I filed lawsuits in the name of THMI,

10  I'd probably get the same motion to dismiss in reverse.

11          There is certainly a unity of interest and

12  ownership between the corporate entities.  There's an

13  existence of the only indebtedness with one of the objecting

14  parties, FLTCI.  The Debtor borrowed supposedly the $100,000

15  from THIB, and the subsidiary guaranteed that $100,000.  And

16  we know that it's paid back some 35 or $36,000.

17          The parent not only owns a majority of the sub-

18  stock but all of it.  The only officers and directors are

19  Barry Saacks.  It's the same between both companies.  And the

20  companies have not observed any corporate requirements, and

21  the registrations have not been made and fees have not been

22  paid.

23          No business was ever conducted under the name of

24  the Debtor, and after the closing no business was conducted

25  under the name of THMI.  I mean, that was by design.  As part

1    of the transaction, the employees, as I indicated, migrated

2    overnight to the new operating entity.

3            Your Honor, I don't think there's a legitimate

4    question that there's a unity of interest and ownership

5    between the Debtor and subsidiary under these cases.  The

6    real question under Eastgroup is whether or not there is a

7    benefit to creditors of the Debtor and THMI or whether or not

8    there -- the consolidation is necessary to avoid harm.  In

9    this case you have a couple of different things going on.

10   You've consolidated -- Your Honor, how am I doing on time.

11   I haven't --

12           THE COURT:  You've got about a minute in your 25.

13           MR. BERMAN:  Okay. I'll speed through.  The benefit

14   to creditors is that you have already taken ahold of pending

15   litigation claims in this case.  THMI could pursue claims in

16   its own name, but there is confusion, at least in my mind, as

17   to who the right party in interest is to pursue many of those

18   claims, whether they're D&O claims -- we now know of D&O

19   coverage.  Whether it's professional liability claims -- and

20   there are substantial ones in that regard.  Whether they're

21   fraudulent transfer or piercing or alter ego claims, all of

22   which are being pursued sort of through the Trustee, both in

23   her capacities for the Debtor and THMI.  That will clarify

24   things and certainly that will avoid harm to the creditors.

25           Also, this Court has jurisdictional questions that

1    you've raised in your own right, and Judge Moody has raised.

2    And you have a consolidated trial going to trial in September

3    and October on a lot of these issues and that will be

4    certainly cleared up.

5           There's been sort of a baiting or a taunting from

6    the opposing parties that we should have to petition in THMI

7    into bankruptcy.  And we haven't done it because we don't

8    really think there's a legitimate difference in corporate

9    structure between the two entities.

10          Finally, Your Honor, I would point out that all of

11   the legitimate creditors in this case support consolidation.

12   I've conferred with both the Wilkes group, and with Mr.

13   Christian today, and their preference should certainly be

14   considered and they're not going to be harmed at all.

15          According to FAS, and FLTCH, and Mr. Backenroth,

16   there should be no other creditors out there.  The only

17   creditors are ones who are here.  If there's a question of

18   other creditors being out there, you can resolve that issue

19   through some sort of additional noticing, whether it's notice

20   by publication or whatever, but consolidating the entities

21   will only bring in additional assets into the estate.

22          The further fix, if this Court has any outstanding

23   concern about creditors being creditors of only THMI

24   versus the Debtor, how you resolve that is by allowing the

25   consolidation but having distributions be separate according

1   to the assets that might come into the estate.  And that's an

2   easy fix.  We've done that in many other cases, and that

3   solves any potential concern.

4         The objections that were raised by the various

5   parties, I don't believe they're creditors.  Even if they

6   are creditors, their rights are not being prejudiced by

7   consolidation.  If they have a claim and they want to look

8   solely to the Debtor, there's a way for them to do that if

9   this Court fashions appropriate relief that way.  If they

10  want to look solely to THMI, if they have an individual claim

11  that's not a joint claim, something that's not been filed,

12  you can certainly deal with that.

13        For those reasons, Your Honor, I'd like to reserve

14  whatever couple of minutes for rebuttal that I might have,

15  Your Honor.

16        THE COURT:  You've got about two minutes left.

17        MR. BERMAN:  Okay.

18        THE COURT:  So that's fine.

19        MR. BERMAN:  Thank you, Your Honor.

20        THE COURT:  Mr. Ruiz-Carus?

21        MR. RUIZ-CARUS:  Yes, Your Honor.  Just very

22  briefly.  I think the law is clear that the nondebtor's

23  creditors have to be given notice and an opportunity to be

24  heard.  I think we've been given notice and an opportunity to

25  be heard.  My clients are all creditors of THMI, clearly.  We

1  have no objection to the substantive consolidation.  We do

2  not believe the material facts are in dispute.

3       We also think it's clear there's a benefit to the

4  estate.  In discovery we've learned that there's D&O coverage

5  for THMI's officers and directors and we've recently learned

6  that there could have been a tail policy purchased, too.

7       We don't have the policy, we don't know what the

8  extent of that is, but we think that that would be a benefit

9  to the estate if THMI were substantively consolidated into

10  the estate -- of the presence of that D&O coverage for the

11  transactions that we're talking about in 2006.

12       Also, the Debtor, in their papers, reference that

13  the factors of substantive consolidation are akin to piercing

14  the corporate veil.  In looking at those three factors, was

15  there a disregard of the corporate entity?  We think

16  without a doubt Mr. Backenroth's testimony, as the Debtor's

17  representative, establishes that it's undisputed that there

18  was a disregard of the corporate form.

19       The unity of interest is also, I think, undisputed,

20  when you look at the admissions made by the Debtor's

21  representative and the fact there were no operations after

22  March 28th, 2006.

23       And the last factor is the most significant one,

24  which is:  Will maintaining the corporate veil protect and

25  promote fraud or other injustice?  And we think it's clear,

1  from Kristi Anderson's deposition in particular, that a

2  fraudulent defense was mounted.  And it's this ability to

3  separate the Debtor from THMI that gives the ability to at

4  least argue that the other side of the room has a right to

5  defend THMI.

6         And they utilized that in January of 2012 in the

7  Nunziata case and we think that is clear from Ms. Anderson's

8  deposition.  And allowing that to continue, the maintenance

9  of the corporate form here, we believe promotes injustice and

10  fraud.  And so given that and all the other factors, we think

11  it's clear that substantive consolidation should be allowed.

12  Thank you, Your Honor.

13         THE COURT:  Thank you, Mr. Ruiz-Carus.

14  Mr. Christian, would you like to add anything?

15         MR. CHRISTIAN:  Yes, Your Honor.  On behalf of the

16  Estate of Darson, we do not object to the consolidation and,

17  in fact, we concur that it would be appropriate.  It would be

18  beneficial to this creditor.  And we believe, for the reasons

19  set forth by Mr. Berman, that it is entirely proper that

20  consolidation be granted.  Thank you.

21         THE COURT:  Thank you, Mr. Christian.  Okay.  Very

22  well.  Mr. Berman, you still have a couple of minutes.  You

23  can reserve it until after the Defendants address the Court.

24         MR. BERMAN:  Thank you, Your Honor.

25         THE COURT:  And, Mr. McCoskey, I see you're ready

 1   with a running start here.  If you're ready, we can start the

 2   clock.

 3           MR. MCCOSKEY:  I am, Your Honor.  Thank you.  Your

 4   Honor, first I'll identify that there was a joint opposition

 5   to this summary judgment motion that my clients and others

 6   filed.  That's Document No. 188.  I'm not going to hit every

 7   point that was raised or every opposition that was raised in

 8   that filing, but I do think each and every one, together or

 9   standing alone, argues against a summary judgment and I'd ask

10   the Court to certainly take note of our written submission as

11   well.

12           We identified several bases.  First and foremost,

13   Your Honor, Mr. Berman attempted to get out in front of

14   this issue and argued it.  And we think it's more compelling

15   on this side.  That is, to be clear, they are seeking to

16   substantively consolidate a nondebtor entity, to drag into

17   this proceeding another company that, at this point

18   apparently, they have elected not even to maintain its

19   corporate existence.  So what is it that we're pulling

20   into this estate?  I'm not sure that I know.

21           I do know, Your Honor, that Judge Jennemann

22   has said that courts cannot and should not simply drag

23   unwilling entities, that never chose to file bankruptcy, into

24   a bankruptcy forum simply because it is expedient and will

25   help one party or another.  And I would submit, Your Honor,

1  that were you to issue a written opinion on this motion for

2  summary judgment, it could be no more than those two lines.

3          I think, Your Honor, it is crystal clear, when

4  you see the Trustee standing arm-in-arm with her litigation

5  partners, the estate claimants, and suggesting that this is

6  essential at this point that THMI be given the same standing

7  and rights as a Debtor.  Irrespective of whatever steps those

8  parties have taken to perfect that status, I think it's

9  evident that they're seeking this as a means to advance their

10  litigation interests.

11          It simply cannot be, Your Honor, that the

12  Trustee could stand up and say that two paragraphs filed in a

13  complaint, suggesting that PLGL litigation has been resolved,

14  means that they have done due diligence and determined that

15  THMI has no other creditors.  It simply can't be enough,

16  Your Honor, that Mr. Ruiz-Carus stands up and says, "I'm a

17  creditor; I approve."

18          That's not what sustentative consolidation is all

19  about.  It is a drastic remedy and it affects potentially a

20  number of parties.  It affects dramatically the parties in

21  this courtroom, but there is no one that you've heard that

22  has said has done any due diligence to make sure that all

23  parties have been notified.

24          Your Honor, I don't want to give short shrift to

25  the cases on substantively consolidating a nondebtor.  I will

1  identify just simply, as Mr. Berman did, that there are three

2  cases principally that we rely on from Judge Jennemann and

3  Judge Funk, they are all very recent 2012 decisions, and I

4  think this is an issue that Your Honor is certainly familiar

5  with and able to analyze.

6        The second point, Your Honor, that I want to make

7  sure that we highlight as our argument, is that the Trustee

8  in this case has wholly failed to meet her burden and to

9  demonstrate that there is a substantial identity between

10 these two entities beyond the corporate parent-subsidiary

11 relationship.

12       And as an aside to that, I would say perhaps I

13 long for days in the past when summary judgment motions

14 were argued with citations to the record and specific facts

15 instead of, as I heard through the recitation of the facts,

16 I heard Mr. Berman say, "I think the evidence is coming out

17 now," when he was identifying for the Court facts in support.

18 I don't know that Mr. Berman's subjective belief of what the

19 evidence is supports a motion for summary judgment.

20       Mr. Berman said he was so concerned about a

21 Troutman lawyer -- that a Troutman lawyer was so concerned

22 ethically, that presumably he sent himself an email for that

23 reason.  I don't know how that's evidence.  The lawyer

24 testified to what the lawyer testified, but reading into it

25 and making argument from that, Your Honor, are not facts.

1          Mr. Berman said -- and this is a quote, I wrote it

2     down as such.  "They've obviously comingled whatever they

3     had."  I certainly haven't seen that record evidence, Your

4     Honor, and that's arguing well beyond the record.

5          I think when Mr. Berman argued about that Troutman

6     lawyer, immediately after supposing that there was such an

7     ethical concern that presumably caused the lawyer to do

8     something, Mr. Berman then said, "But the record evidence

9     also supports the motion," as if going outside the record,

10    making argument to the Court, and then returning to the

11    record is somehow appropriate on a motion for summary

12    judgment.

13         Your Honor, the key point and the key fact that's

14    not been established -- and Mr. Berman argued it again as if

15    it's a fact -- is found in paragraph 24 of the motion itself.

16    This, Your Honor, is within the Debtor's own recitation of

17    what are supposed to be undisputed facts.

18         Paragraph 24 starts off and says, "Neither FLTCI

19    nor THMI ever had any business operations separate and apart

20    from each other."  No record citation.  Simply a conclusion

21    and an argument that's made and then there are additional

22    facts going.  Mr. Berman repeated that error today and made

23    the exact same argument.  That is, that these entities never

24    had any business operations separate and apart from each

25    other.  I don't know what the record evidence of that is.

1          I do know the record evidence that the Trustee has

2   set forth in the papers, which is that there was a parent-

3   subsidiary relationship, that both of these entities --

4   neither intended to pursue additional business opportunities

5   beyond the stock purchase arrangement, and that they failed

6   to observe corporate formalities in many respects.

7          Those are the record facts that were cited.  And

8   from that, we've taken a giant leap to argument disguised as

9   fact that neither the Debtor nor THMI ever had any business

10  operations separate and apart from each other.  And that

11  surprised -- I actually thought at times I was confused,

12  as Mr. Berman was arguing.  I wasn't sure if he was trying

13  to substantively consolidate THMI and FLTCH at times.

14          If we are talking about the substantive

15  consolidation of this Debtor, that was a holding company --

16  undisputed it was intended and was a holding company.  If

17  there are arguments about Mr. Saacks' status as to the

18  stockholder of FLTCI, what is undisputed in the papers and in

19  the record is that he signed the stock purchase agreement.

20          So we can speculate about his motives six, eight

21  years later.  We can spin his testimony and -- as I suppose,

22  sad as it is, we have identified additional testimony where

23  the gentleman in 2012 or 2013 is obviously confused about

24  events in 2006 and did not have a sophisticated handle in

25  2012 as to what might have transpired in 2006.  But there are

1   no facts relating to the events in 2006 beyond the disputed

2   testimony and the spin that's been placed on Mr. Saacks'

3   deposition.

4         Your Honor, it really is problematic to respond

5   to the motion for summary judgment knowing that we're not

6   arguing the facts anymore -- we're arguing the implications;

7   we're arguing the spin.  The facts themselves demonstrate,

8   I believe, Your Honor, exactly what we said in our motion.

9   And that is:  The Trustee shows only the existence of two

10  separately incorporated entities in a parent-subsidiary

11  relationship that had wind-down operations, if at all.

12        That falls far short of suggesting that they never

13  had business operations separate and apart from each other.

14  And so, Your Honor, on that basis, we think factually the

15  motion suffers.

16        And finally, Your Honor, we are back at a point

17  that has arisen in this case numerous times.  It seemingly is

18  getting worse.  And that is the Trustee's ability to advocate

19  this position on behalf of THMI as if THMI is separately and

20  independently either consenting or seeking this relief.  Your

21  Honor, the conflict -- and I have to point it out.  It's been

22  the most compelling that we've seen recently, although we

23  think it has continued.

24        Your Honor said a long time ago, THMI should be

25  defended to the utmost.  And recently, in two appeal issues,

1    it could not be more clear that the Trustee's counsel is

2    rolling over in those cases.  And as unpleasant as it may be

3    to say or to hear, Your Honor, we have outlined those papers

4    that have been filed in both Webb, a victory for THMI, a

5    complete reversal of a $900 million judgment that the Trustee

6    then, after the fact, advocated that, "Well, we didn't really

7    seek that relief and maybe we're not -- we don't want that."

8            And then, Your Honor, in Nunziata, more recently --

9    and that is a critical issue right now in that that -- in

10   Nunziata, that appeal has been briefed and argued.  And

11   post-oral argument the estate's filed a motion and they said,

12   "We need to dismiss this appeal all together.  THMI wasn't

13   authorized to file the appeal."

14           The Trustee filed a response that says, "Yes,

15   that's right; this was an unauthorized appeal," ignoring

16   the fact that prior oral argument, ignoring the fact that

17   sometime before, they had actually ratified the filing of

18   the appeal and participated in the appeal and briefed it.

19           Now, though, after oral argument, after the $200

20   million is at risk, and certainly based on the timing of

21   this substantive consolidation motion, with the idea that

22   potentially they hope that Your Honor will give them a free

23   pass to run free and clear with THMI, that they can now tank

24   the Nunziata appeal.

25           So, Your Honor, we are at a stage in this

1   litigation where, first and foremost, the relief is not

2   warranted under the Bankruptcy Code.  Secondly, factually,

3   they've come nowhere close to supporting the motion.  And

4   finally, the practical effect of even advancing the motion

5   highlights the conflict problem, highlights the litigation

6   issues, and exactly what I suggested upfront, which is Judge

7   Jennemann's words, that substantive consolidation should not

8   be awarded simply because it's expedient or will help one

9   party or another.

10          Mr. Berman has suggested in the papers and

11  obliquely here today that, "Well, this solves all of Judge

12  Moody's problems, all of Judge Moody's issues on remand and

13  to a certain extent it allows the Court to address those."

14  And, Your Honor, it certainly would, but that doesn't mean

15  that it should or that it could.

16          Judge Moody has asked for certain determinations to

17  be made.  Judge Moody didn't ask the Trustee in this case to

18  file a motion for substantive consolidation and seek certain

19  findings from the Court that may affect the litigation down

20  the road.  Judge Moody didn't tell the Trustee what to do.

21  Judge Moody said, "This is an issue that needs to be

22  addressed."  And it will be at trial.

23          There is no doubt that, as we get to the trial

24  later this year, these issues will be front and center.  But

25  simply for expediency purposes, saying that we are solving a

1   District Court problem by entering a summary judgment on

2   behalf of the Trustee on an issue that has no support, legal

3   or factual, Your Honor, that's simply not appropriate.

4           And what we would ask is that Your Honor deny the

5   motion and we proceed forward in the litigation.

6           THE COURT:  Thank you.  Okay.  Let's see, who's

7   going next?  Okay, Ms. Redmond.  And did you -- you reserved

8   five minutes or ten minutes?

9           MS. REDMOND:  Your Honor, five minutes.

10          THE COURT:  Okay.  Very well.

11          MS. REDMOND:  Your Honor, on behalf of the THI

12  Receiver, we had an appeal pending before Judge Scriven.

13  And as I had advised the Court before, that appeal was

14  stayed pending Your Honor's determination of the relationship

15  between the Debtor, FLTCI, and THMI.  And so we're very

16  interested in this particular issue.

17          Your Honor, there's been also an assertion by

18  the Trustee and by the Wilkes Plaintiffs that we don't

19  hold a claim.  Your Honor, our claim is by virtue of the

20  stock purchase agreement and by virtue of being a seller

21  indemnified party.  And, Your Honor, quite simply, there are

22  reps and warranties in the agreement and those include a rep

23  and warranty that THMI and the Debtor were both solvent and

24  had adequate capital at the close of the transaction.

25          I don't know at the end of this litigation if

1   that's going to turn out to be true or not, but if that turns

2   out to be untrue then the Receiver, on behalf of THI, as a

3   seller indemnified party, would have a claim -- capped at the

4   purchase price of $100,000, but a claim nonetheless.  So we

5   do have standing to bring this.

6          Your Honor, Judge Jennemann's decision evinces

7   a concern for due process.  And that was exactly the same

8   concern Judge Isicoff had in the S & G Financial case.  I

9   represented the largest creditor of the transferee in this

10  case, and Judge Isicoff labored on a couple of things.

11  How do we adequately notice people who are creditors of a

12  nondebtor?  And so she put in place a process to make sure

13  everyone got notice.

14          This didn't come before the Court in an adversary

15  proceeding with distinct parties, but rather it came before

16  the Court on a motion to substantively consolidate.  So

17  this issue in isolation, this notice to all creditors and

18  creditors had an opportunity to object, the only objector in

19  that case was the transferee, which was controlled by the

20  principal of the original Debtor who wanted more money for

21  equity.

22          And the last factor, and the most important to

23  Judge Isicoff, was that before substantive consolidation,

24  she had a piece of property sold that was owned by the

25  transferee.  And when the property sold, the proceeds from

1  the property were enough to pay all creditors of both the

2  transferee and the Debtor a hundred percent of their claims,

3  with some left over to go to equity.

4         So for those reasons, Judge Isicoff, unlike Judge

5  Jennemann and unlike Judge Funk, found that it was okay to

6  consolidate a nondebtor, but because those protections were

7  there.  And my point in this case, and the Receiver's point,

8  is that in this case there has been no claims processed,

9  there's been no notice, there's been no due diligence.

10 There could be claimants out there; we don't know.

11        And in order to balance the benefits against the

12 harms, in order to order substantive consolidation, one needs

13 to know who's being benefitted and who those creditors are.

14 And they ought to have a voice.

15        This isn't something that should be decided on

16 summary judgment.  It ought to be something that's decided

17 after a process, whatever that is.  It doesn't necessarily

18 have to be a filing.  It could be a filing which sets up the

19 Bankruptcy Court process.  But it ought to be a process

20 that mimics the bankruptcy process in order to give fair

21 opportunity to be heard and fair notice to people who might

22 be affected by substantive consolidation.

23        And for those reasons, Your Honor, we think there

24 are material facts.  There are material facts with respect to

25 the impact on unknown creditors and therefore that summary

1  judgment should be denied.

2         THE COURT:  Okay.  Well, thank you.

3         MR. BALASSA:  Good afternoon, Your Honor.  My

4  clients, the GTCR entities, THI Holdings, and Mr. Jannotta

5  filed a limited objection to take issue with certain factual

6  assertions in the Trustee's filing.

7         Mr. Berman didn't assert any of those particular

8  facts in his argument, so I'm not going to speak to that.

9  But I remain concerned that he stands before the Court

10  and uses this motion as a platform to impugn my clients

11  indirectly.

12         Mr. Berman has stood here, and most of what he said

13  relates to the post-sale activities.  But he did make some

14  suggestion, without citation to record, of course, that the

15  sellers knew what was going to happen with these entities

16  post-sale.  And because this is a motion for summary judgment

17  my clients would be concerned if Your Honor were to make

18  any findings that those assertions had been undisputed. Those

19  assertions not only lack any factual support -- and none has

20  been cited to the Court -- but they are disputed in fact.

21         The restructuring transaction, there were a series

22  of transactions that occurred on March 28th, 2006, two of

23  which were the sale of THI of Baltimore and THMI.  It was a

24  complex multi-party restructuring, and my clients were

25  investors in THI and -- my client, Holdings, which sold THI

1  of Baltimore -- and, Your Honor, sold these two entities to

2  the buyer side.  Sold THI of Baltimore and THMI after

3  contentious and lengthy negotiations.

4           This was not some collusive activity, and there's

5  no evidence to support that there is.  There has been

6  deposition testimony about why THI of Baltimore and THMI

7  were sold, but they are business reasons.  They're not to

8  avoid PLGL liabilities.  And there's just no factual support

9  for those assertions and none that's been cited.

10          THI did not meet Barry Saacks; there was no live

11 closing.  Troutman Sanders didn't communicate any concerns to

12 the seller side.  All of the facts, so-called facts or

13 assertions, that Mr. Berman makes relate to the post-sale --

14 alleged post-sale activity, and relate to the buyer's side;

15 they don't relate to the seller.  And I'd ask that Your Honor

16 avoid making any findings or reaching any conclusions with

17 respect to the THI side, the seller's side, as to these

18 transactions on this motion.

19          THE COURT:  Okay.  Well, thank you.  And that --

20 I believe that concludes the responses.

21          MS. REDMOND:  I thought Mr. Gart --

22          MR. GART:  Your Honor, the Debtor --

23          THE COURT:  Oh, I'm sorry, Mr. Gart.

24          MR. GART:  -- had filed an objection as -- Your

25 Honor, I don't have anything to add; everyone has covered it.

1    I would just simply add that we wanted the Court to be aware

2    and to remind the Court of all of the procedural concerns

3    that were raised by the summary judgment motion.

4            I think Your Honor's aware that the -- Your Honor's

5    decision concerning the allowance of the Jackson claim is

6    currently on appeal before Judge Scriven.  It has not been

7    abated, and we believe that a sub-con ruling at this stage

8    would certainly be premature and gut the Jackson appeal

9    before a decision on the merits.

10           But probably more importantly, it potentially flies

11   in the face of Judge Moody's reversal and remand of the

12   settlement order, as Mr. McCoskey indicated.  And we don't

13   think this resolves that determination or resolves it for

14   purposes of Judge Moody's remand.

15           Certainly the record currently before the Court

16   doesn't support sub-con.  Maybe they can do it at trial.

17   Mr. Berman, throughout his presentation, said:  The concept

18   is coming out, this will all be cleared up, Mr. Baker's

19   testimony was protected by privileges and documents they

20   don't have.

21           So, again, Your Honor, it's just premature.  And

22   it being premature, certainly is not a resolution within the

23   scope of Judge Moody's remand, in our view.  So we think that

24   would certainly prejudice the Debtor and would be premature.

25           We also disagree with some of the Trustee's

1    characterizations of the relevant facts as undisputed.

2    Mr. Berman's characterization of Mr. Saacks' testimony, I

3    would note that they did not add his most recent testimony

4    and, quite frankly, that testimony shows that not that he

5    didn't realize he had formed an entity, he simply didn't

6    remember.

7            I would also assert that Mr. Berman

8    mischaracterized Mr. Backenroth's testimony.  I won't

9    go further than that because there's now a request to

10   depose Mr. Backenroth.  But we certainly think there was a

11   business purpose separate and apart from THMI and I think

12   Mr. Backenroth has testified to that.  But all of this is

13   just characterization of testimony and it would be premature

14   for Your Honor to rely on that as a basis for granting

15   summary judgment.

16           THE COURT:  Okay.  Thank you, Mr. Gart.  And, Mr.

17   Berman, you've got a couple of minutes left.

18           MR. BERMAN:  Thank you, Your Honor.  Quickly,

19   Mr. Balassa's point, I think, is well taken, that we're not

20   looking to have you make any findings or conclusions that are

21   going to prejudice any of the Defendants' rights to defend

22   themselves in the pending litigation.  That wasn't the goal

23   of the substantive consolidation.

24           The goal was to address the issues that you asked

25   us to address and that's what we tried to do.  We're not

1    looking for you to make findings as to his clients' conduct

2    because I don't think it's particularly relevant to the

3    determination on substantive consolidation.

4              As for Ms. Redmond's arguments, it seems that she's

5    arguing for creditors that she thinks may exist but are not

6    here.  I'm not aware of any such creditors.  Her client is

7    certainly here.  If they have a $100,000 claim that can be

8    dealt with in the case.  Obviously, we dispute that there is

9    a claim.

10             I'm not aware of any other creditors, and the

11   people who have the greatest knowledge, FLTCH and FAS, the

12   folks who have the files with respect to the professional

13   liability, general liability claims, say there are no other

14   claims other than the seven personal injury claims that are

15   before the Court.

16             So that brings us to Mr. McCoskey's position.  The

17   motion to dismiss filed by FLTCH and FAS and that whole group

18   can be found at Docket 79 in the 893 adversary proceeding.

19   And I'm reading from footnote 2, which I think is

20   particularly instructive.

21             The moving Defendants -- that's that whole FLTCH

22   group -- are not subject to the relief requested in Count I

23   and thus neither accept nor object such relief.  Count I

24   is essentially unopposed because the Trustee and her same

25   attorneys are effectively both the Plaintiff and Defendant in

1  that count.  Because of the conflict, it is not expected that

2  THMI will mount much of a defense to Count I, as it should.

3  Nevertheless, the moving Defendants deny the accuracy of many

4  of the factual allegations incorporated into this count which

5  denial is not relevant for purposes of this motion.

6          They don't touch it.  They say they don't care, it

7  doesn't affect them, they're not involved.  Yet, we have four

8  oppositions to the motion for summary judgment.

9          Finally, Your Honor, Mr. McCoskey said that this is

10  just like Judge Jennemann's case where unwilling participants

11  are dragged involuntarily into this court, maybe arguing that

12  that sort of subverts the involuntary petition.

13          You've determined that Ms. Scharrer controls the

14  stock of THMI.  It's part of the stock, it's part of the

15  estate, and she's the only one who can speak on behalf of

16  that entity.  She's the movant, she's the requesting party,

17  and procedurally it's in the adversary complaint.  Both the

18  Debtor, through Ms. Scharrer, the estate and THMI are co-

19  Plaintiffs in that adversary proceeding, and she's not an

20  unwilling participant.

21          Your Honor, finally I'd like to read to you,

22  because there were arguments that we haven't given you

23  citations in the record.  If folks want to look at the record

24  evidence that is before the Court, I could give page and line

25  citation if we had more time.  It's all in the evidence

1  binders that I've handed out and that's record evidence.

2       But there was a specific argument that I have

3  somehow mischaracterized Mr. Baker's testimony.  At page 217

4  of the second day of Mr. Baker's deposition, I asked him the

5  following question.

6       "Sure, you had concerns about Mr. Saacks, as I

7  understand your testimony."

8       The answer:  "Uh-huh."

9       "Is that correct?"

10      "Correct."

11      "And those concerns stem from Mr. Fleishman's

12 observation of Mr. Saacks' disheveled nature, lack of hygiene

13 and his interactions with Mr. Grunstein, if I understand your

14 testimony.  We don't know exactly what happened because a

15 claim of privilege was asserted.  Is that correct?"

16      Answer:  "A claim of privilege was asserted.  And

17 what was before that, that you said?"

18      "That you had concerns based on Mr. Fleishman's

19 observation of both Mr. Saacks' and Mr. Grunstein's

20 interaction with Mr. Saacks."

21      Answer:  "Based upon Mr. Saacks, what did you say

22 again?"

23      "Let me start again," I said.  "As I understand

24 your testimony, you had concerns based on what Mr. Fleishman

25 observed, both with respect to Mr. Saacks himself, his

1  disheveled nature, his lack of hygiene and Mr. Grunstein's

2  interaction with Mr. Saacks."

3          Mr. Baker said, "Correct."

4          "Did you ever put your concerns in writing?  Did

5  you send an email, write a letter, a memo to the file,

6  research memorandum, anything where you described the

7  observation that caused you concern?

8          Answer:  "I may have."

9          Question:  "And to whom would that writing have

10  been sent?"

11          Answer:  "It might have been just sent to me."

12          Question:  "You sent an email to yourself

13  memorializing the concerns?"

14          Answer:  "Possibly."

15          Question:  "And where would you have sent that

16  email, to a personal account or your firm email account?"

17          "It could have been a personal account."

18          THE COURT:  And you've got about 15 seconds.

19          MR. BERMAN:  Your Honor, I think the burden has

20  shifted in this case.  I think we've more than established

21  the necessary elements.  And the arguments against

22  consolidation are not factual; they're positional.

23  The targets in this litigation are the ones opposing

24  consolidation, not the legitimate creditors who have

25  requested we consolidate these estates, Your Honor.

1    Thank you.

2         THE COURT:  And, Mr. McCoskey, the last word

3    doesn't always win.

4         MR. MCCOSKEY:  I am going to waive whatever extra

5    time I might have.  On account of Mr. Berman exceeding his

6    time, I will yield it.  I thought I had something to say, but

7    I agree with the Court and I'll waive it.

8         THE COURT:  That was an excellent point.  Thank

9    you.  Very well, I've listened to the argument carefully, and

10   I appreciate the excellence of your presentations.  I've read

11   what you filed.

12        Count I of the complaint is, as the parties are

13   well aware, one for substantive consolidation.  It is a

14   little different than the other counts, but arises out of

15   the same nucleus of facts that go through the very, very

16   extensive complaint that I had an opportunity to address in

17   a recent ruling on the motions to dismiss.

18        On summary judgment, I can certainly give guidance

19   to the parties on the legal issue that's been raised, and

20   that's whether or not the Bankruptcy Court has the power to

21   order substantive consolidation of a Debtor with nondebtor

22   entities.  I've read the case law.  Well-respected judges,

23   Judge Jennemann and Judge Funk, in the particular cases

24   they had before them, concluded it was not.

25        Judge Isicoff, following decisions by Judge Paskay,

 1   and Homer Drake in the _Munford_ case -- which is a significant

 2   case for other reasons -- came to the same conclusion.  And I

 3   think Judge Isicoff's recitation of the law is the best

 4   summary there is and I agree with it.  I think that she got

 5   it right.  And frankly I think, given the right set of facts,

 6   Judge Funk and Judge Jennemann could come to the same

 7   conclusion.  These are fact-driven things.

 8          Now, then the question is, given that:  Is this a

 9   case for summary judgment?  I am not comfortable dealing with

10   this issue separately from the other issues here.  This is

11   part of a much bigger presentation.  I think I need to

12   allow discovery to be concluded and to deal with this

13   comprehensively on the merits.

14          There is a possibility at some point, assuming that

15   the pleadings survive another round of motions to dismiss --

16   it's probable that they will, but I can't prejudge that.  But

17   assuming that, if summary judgment is granted on the other

18   counts, then I will revisit summary judgment on this count.

19          If it's not granted on the other counts, then this

20   issue, this count, will be tried with all the other counts,

21   so that I can ensure that whatever I decide, it will go up

22   for further review with a full record rather than just the

23   record over which parties have different views.  And so for

24   that reason, I will deny the motion for summary judgment.

25          And Mr. Berman, you can just give me a one-line

 1  order.  It doesn't even have to be for the reasons stated

 2  orally in court because I didn't make any findings.  I'm

 3  just denying it based on that there are factual issues.

 4          MR. BERMAN:  And I assume I can include, for the

 5  clarity of the record, that it's without prejudice and with

 6  leave to re-file.

 7          THE COURT:  Yes, that it's -- yes, that it's

 8  without prejudice to being filed again in connection with --

 9  after the discovery is concluded in connection with other

10  summary judgment motions that may be filed, so we can deal

11  with this.  I don't want to leave this one hanging out there

12  and I grant summary judgment in some other count and you

13  can't come back, given the change of the circumstances; okay?

14          MR. BERMAN:  Yes, Your Honor.

15          THE COURT:  Okay.  I think that brings us to the

16  indemnification motion and that's -- Ms. Redmond was going to

17  start off with that.  Let me get my notes out.

18          MR. CHRISTIAN:  May it please the Court, Your

19  Honor, this is Harold Christian.

20          THE COURT:  Mr. Christian, you may be excused,

21  if that's what you're asking.

22          MR. CHRISTIAN:  Thank you kindly, Your Honor.

23          THE COURT:  Okay.  Have a good day.

24          MS. REDMOND:  Your Honor, may I approach to

25  hand up a --

1          THE COURT:  You may.

2          MS. REDMOND:   Thank you.

3          (Documents presented to Court and counsel)

4          THE COURT:   Okay.   We'll be arguing the motion

5    to dismiss that was filed by Ms. Redmond and the expedited

6    motion for partial summary judgment that was filed by the

7    Trustee and the opposition to that.

8          As we discussed previously, I would request that

9    you combine those arguments, so Ms. Redmond can go first.

10   She can argue both of them at the same time, make such

11   distinctions as may be appropriate.   And how long do you

12   think you would need for that argument?

13         MS. REDMOND:   Your Honor, I think 15 minutes.

14         THE COURT:   15 minutes?

15         MS. REDMOND:   15.

16         THE COURT:   That's certainly acceptable to the

17   Court.   And will anyone else be arguing that except for you

18   on your side of the fence here?

19         MS. REDMOND:   I don't think so.

20         THE COURT:   Okay.

21         MS. REDMOND:   And, Your Honor, if I could reserve

22   maybe three minutes for rebuttal?

23         THE COURT:   Okay.   So you want 15 and 3 or 12

24   and 3?

25         MS. REDMOND:   15 and 3.

1          THE COURT:  Okay, you've got it.  And Mr. Berman?

2          MR. BERMAN:  Your Honor, I would -- I'll endeavor

3   to do mine in the same 15.  I was sort of hoping for 20, but

4   I don't know how --

5          THE COURT:  I'll give you 18; how about that?

6          MR. BERMAN:  I'll --

7          THE COURT:  But you don't get any rebuttal.  It's

8   just going to be:  She's going to go, you're going to go,

9   then she's going to finish.

10          MR. BERMAN:  Fair enough.

11          THE COURT:  Okay.  So you've got 18.  And Ms.

12   Redmond I'll go ahead and start your clock.

13          MS. REDMOND:  Okay, Your Honor.  This is the

14   Receiver's motion to dismiss with respect to two of the

15   counts that are in the Trustee's complaint.  Those counts are

16   the determination by this Court that the Barton doctrine does

17   not apply to the Trustee's action, and the Trustee's claim to

18   determine a right to indemnification and a right to enforce

19   that right against the Receiver and the Receivership estate.

20          Your Honor, the other two counts deal with an

21   objection to claim, which I'm happy to address and happy that

22   this Court could address.  And the other is a request for

23   turnover of books and records which we've responded and said

24   we've turned over everything, together with a privilege log.

25   So those two are not really before the Court today.

1          Your Honor, the first point that the Trustee asked

2    this Court to do is to make a determination of whether or not

3    the Barton doctrine applies.  Your Honor, the Trustee asks

4    you to do that in order to have this Court enforce a right to

5    indemnification, to determine the timeliness of that right,

6    to determine the priority of that right in the Receivership

7    estate.

8          Your Honor, if I could quote from Barton v. Barbour

9    which is the 1981 (sic-1881) case which involved in fact a

10   Receivership.  The Court there said -- and this is the first

11   page of the submission.  "The evident purpose of a suitor who

12   brings his action against a Receiver without leave is to

13   obtain some advantage over the other claimants upon the

14   assets in the Receiver's hands"

15          "A suit therefore, brought without leave to

16   recover judgment against a Receiver for a money demand, is

17   virtually a suit the purpose of which is, and the effect of

18   which may be, to take the property of the trust from the

19   hands and apply it to the payment of the Plaintiff's claim,

20   without regard to the rights of creditors or the orders of

21   the court which is administering the trust property.  We

22   think, therefore, that it is immaterial whether the suit is

23   brought against him to recover specific property or to obtain

24   judgment for a money demand.  In either case leave should be

25   first obtained."  And that leave and that determination can

1    only, in accordance with <u>Barbour</u> be made by the Receivership

2    court.

3            Now, the Trustee asks Your Honor to enforce its

4    indemnification claim and there's two ways that Your Honor

5    could do that.  One is to tell the Trustee to file a claim.

6    Well, it's now been over two years since the Trustee has been

7    in place and the Trustee has known about the Receivership

8    estate.  The Trustee has not sought to file a claim during

9    that time.  The claims bar date -- two claims bar dates have

10   passed.  Publication notice was given and the Trustee has not

11   asserted to have a claim determined as timely in that estate.

12           The other that the Trustee may be seeking because

13   I'm not sure the word "enforce" means, is payment from the

14   Receivership estate.  And that would entail Your Honor

15   determining not only the timeliness of the claim, but this

16   claim was entitled to priority over the $18 million of

17   legitimate stakeholders who filed timely claims in another

18   court's Receivership estate.

19           Your Honor, this can't be.  <u>Barton</u> clearly requires

20   that the Trustee receive leave from the appointing court

21   before doing that.  Not even looking at the style of the

22   Trustee's action, the Trustee says Scharrer, Chapter 7

23   Trustee v. Trans Healthcare, Inc., individually, and by and

24   through its Receiver.

25           If you look at the first line of the <u>Barton v.</u>

1    Barbour case, it says:  This was a suit brought by Frances

2    Barton, the Plaintiff, against John S. Barbour as Receiver.

3    Similarly, it's an action against a person as a Receiver.

4            Now, Your Honor, we don't have to look too much

5    further than this Court in this particular case in the

6    adversary, which you had before you, where FAS, FLTCH, and

7    also Christine Zack brought actions in Ohio and New York

8    against THMI in New York and against the Trustee's lawyers in

9    Ohio.

10           And, Your Honor, in your decretal paragraphs, you

11   state that for the reasons stated orally and recorded in open

12   court you find that the prosecution of the Ohio and the New

13   York action -- and this is the second page of the handout --

14   would interfere with the administration of the underlying

15   bankruptcy case and violate the Barton doctrine.

16           Now, the Trustee argues:  Well, I'm only bringing

17   a claim; I'm not suing the Receiver.  But in the New York

18   action, FAS and FLTCH were bringing a claim against THMI;

19   they weren't suing the Trustee or the Trustee's lawyer.

20           And then lastly, Your Honor, I would ask you to

21   look on that page at the bottom.  Your Honor admonished all

22   the parties in this case to cease trying to get alternative

23   relief in other courts.

24           And so, Your Honor, what did the Trustee do?

25   The Trustee complied with the law.  The Trustee, in March of

1    2013, filed with the Receivership court a motion for leave

2    to file the complaint for declaratory relief from breach of

3    contract against Trans Healthcare, Inc. in the United States

4    Bankruptcy Court for the Middle District of Florida.  That

5    was the correct procedure to ask the Maryland court for

6    permission.

7         The Trustee then filed a complaint here on November

8    11, 2013, and then on December 11, 2013 withdrew his motion

9    in the Maryland Receivership court, having never received the

10   leave that he was required -- that she was required to get.

11        Now, Your Honor, both of these things really

12   require that the Maryland Receivership court, with

13   jurisdiction over the property that belongs to the

14   stakeholders in Maryland -- this isn't the Receiver's

15   individual property, this is property that belongs to

16   creditors -- have at least the ability to say, yes, Mr.

17   Trustee or Ms. Trustee, you can go forward in another court

18   and liquidate your claim.

19        Similar to if someone came before you and said,

20   "I need to liquidate a claim in a non-Bankruptcy Court."

21   And you may say, "It makes sense to do that, go ahead and do

22   that."  But someone would come before you first.

23        Now, Your Honor, the second point in furtherance of

24   Barton, the Supreme Court -- and this is on the third page of

25   my handout in the Riehle v. Margolies, case in 1929 talked

1    about Receiverships and said:  Custody of property in the

2    hands of a Receiver is really custody by the court of that

3    property.  And only the Receivership court has the power to

4    determine all questions of ownership and disposition.

5         And I submit, with respect to the *res* which is the

6    property of the Receivership, the Receivership court is the

7    only court that can determine the distribution of claims

8    against it.  Now, Your Honor, I'll acknowledge that the

9    Receivership court, after leave, can give that authority to

10   another court but leave must be taken.

11        Your Honor, the Trustee argues that by virtue

12   of the filing of a claim by the THI Receiver that the THI

13   Receiver has consented to the jurisdiction of this court to

14   determine the claim against the THI Receiver.

15        Your Honor, I think Stern puts an end to that.

16   The court in Stern deals with consent, and the Supreme Court

17   says where there's no choice but to file a claim in order to

18   preserve your rights, bankruptcy's different and consent

19   doesn't have the same meaning.

20        And so under Stern the consent just doesn't

21   make it.  The concern -- the consent is that you, as the

22   bankruptcy judge, can determine our claim.  And to the extent

23   that it's necessary to resolve another claim in connection

24   with our claim, that the Trustee's claim had to be resolved

25   in order to determine our claim, that would be different.

 1   But that's not the case here.

 2          In fact, in the Katchen v. Landy case and the

 3   Langenkamp case, each of those cases involve preferences and

 4   Section 502(d).  And under Section 502(d), it was necessary

 5   to resolve the claim in order to determine the preference to

 6   determine the claim.

 7          So, Your Honor, I wanted to move on to the issues

 8   that the Trustee raises with respect to indemnification

 9   because the Trustee says, on two bases, there's no issue with

10   respect to whether or not the THI Receiver owes an obligation

11   of indemnification to the Trustee -- to the Debtor and to

12   THMI.

13          Number One, Judge, just if I could go back and let

14   you know what the status is of each of the cases that's out

15   there because this is the next slide which is:  Admissions

16   are Not Final.  Finding of Admission by Default is Premature.

17          In the Webb case the appellate court has reversed

18   or remanded with instructions to hear the motion to set aside

19   the default first.  In the Townsend case, it is on appeal.

20   The Sasser case, the motion to vacate default is pending.  In

21   Jones, there was no default.  And in Nunziata, THI was not a

22   party.  And so each of these cases, a determination by this

23   Court that there was an indemnification obligation is

24   premature because there's not even a loss at this point.

25          Now, Your Honor, with respect to Jackson, it's

1   important to understand that in Jackson there was no

2   allegation in this complaint that there was a written demand

3   for indemnification by the Debtor.  The Debtor was being sued

4   in a supplementary proceeding and there was no allegation,

5   nor could there be, that there was a written demand for

6   indemnification.

7          In addition, Your Honor, as a matter of statutory

8   construction the stock purchase agreement and the phrase that

9   the Trustee relies on in order to say that THI is responsible

10  because THI operated the facility -- and let's just take

11  Jackson because that one is clearest in this context.

12         THI, if you assume in that paragraph, you

13  substitute THI -- substitute Auburndale as the facility

14  for THI.  And you say Auburndale is a THI-operated facility.

15  Now, that's what the Trustee says once you reach that

16  conclusion, then you have under the agreement an automatic

17  indemnification right.  However, you can't read that without

18  the parenthetical that follows.  And the parenthetical that

19  follows is:  It is understood that Trans Health Management,

20  Inc., a Delaware corporation, THM, shall be deemed not to

21  have operated facilities for the purposes of determining what

22  facilities are THI facilities.

23         Now, Your Honor, I would draw your attention to a

24  Sixth Circuit case from 1959 which is Hoover Motor Express

25  Company, Inc. v. U.S.   And in that case, the court dealt

1  with statutory construction and what to do with a

2  parenthetical.

3         And in that case there was an issue with respect to

4  the language of a bill of lading.  And that bill of lading

5  said:  Goods received in apparent good order.  And then in

6  parenthetical:  Contents and conditions of packages unknown.

7  And the court there said statutory construction and contract

8  construction require that a parenthetical be deemed to limit

9  the statement that comes before it.

10         So adopting that rule of statutory construction, if

11  you say THI operated Auburndale Nursing Home, you have to

12  then take into account that what that statement gives, the

13  parenthetical takes away, similar to the case before the

14  Sixth Circuit where the statement says:  Goods received in

15  apparent good condition, and then it says:  Content and

16  conditions unknown.  The second statement actually negates

17  the first, but the court finds that the parenthetical is

18  deemed to limit the phrase before it.

19         And Your Honor, lastly, addressing the issue

20  that you've heard many times, and a lot of the Trustee's

21  motion for summary judgment lists a series of admissions, or

22  statements, or representations of counsel on behalf of the

23  THI Receiver.  And, Your Honor, the top of this says:  The

24  complaint does not allege facts sufficient to satisfy the

25  Trustee's burden of proof with respect to judicial estoppel.

 1          And over the last ten years, the Eleventh Circuit

 2    has spoken many times on judicial estoppel.  But most

 3    recently, on September 23rd of 2013, the Eleventh Circuit

 4    spoke in Tampa Bay Water v. HDR.  And in that case -- the

 5    cite of the case 731 F.3d 1171.  And, Your Honor, it defined

 6    what the burden was to show that a judicial -- that judicial

 7    estoppel should apply.  And the first was a prior

 8    inconsistent statement.

 9          And albeit, counsel have appeared in courts

10    and have said that they believed that there was an

11    indemnification obligation.  And that is without a doubt

12    counsel did not do that because they thought it was wrong;

13    counsel did it because they weren't sure of the basis that

14    THI had been defending THMI since before the 2006 transaction

15    took place.

16          But, Your Honor, it isn't just a prior inconsistent

17    statement.  It is a deliberate statement.  If you look at the

18    case law that comes out of the Eleventh Circuit, it's

19    supposed to be calculated -- a calculated statement that's

20    designed to make a mockery of the justice system.  Nowhere in

21    the Trustee's complaint does the Trustee allege that any

22    statement was made deliberately, was made with malice, or was

23    made with any intent to make a mockery out of the justice

24    system.

25          THE COURT:  That's 15.  You still have 3.

1          MS. REDMOND:  Your Honor, the next is Under Oath.

2    Every case except for one in the Eleventh Circuit says that

3    the statement must be under oath.  So statements of counsel

4    under that circumstance don't matter --

5          THE COURT:  I think the case --

6          MS. REDMOND:  -- but the one case that --

7          THE COURT:  I think the case that does say that

8    you're familiar with because --

9          MS. REDMOND:  Yes, Your Honor, I'm very --

10         THE COURT:  -- your law firm was successful in

11   that.  Actually a very well-reasoned case, I might add.

12         MS. REDMOND:  Well, Your Honor, but the point of

13   that case was not judicial estoppel.  The point of that case

14   was to sanction Exxon and its own internal rate of return to

15   stop them from objecting to claims that were baseless.  So

16   any reference to judicial estoppel is dicta in that case.

17         And then lastly, the second, third and fourth

18   points are the Bloomberg v. USAA Casualty case finds that

19   it doesn't -- judicial estoppel doesn't even apply if both

20   parties are aware of the facts, which they were here, and it

21   doesn't apply with respect to issues of law, which the

22   indemnification issue is.

23         Judge, the most important point here is that the

24   complaint alleges nowhere that the declarant or the person

25   against which judicial estoppel is being sought prevailed.

1  In each of these cases, the lawyers seeking to appear for the

2  THI Receiver were denied the ability to appeal.  They did not

3  prevail.  And lastly, the complaint doesn't allege anything

4  about the prejudice to the opposing party.

5        So Your Honor, for those reasons, we think that

6  it's (a) inappropriate for this Court at this point to hear

7  this matter.  Your Honor, there is a stay in effect in the

8  Receivership court.

9        And if anything Your Honor has taught us in this

10  case is that the theme from the Bench has been respect.

11  Although some state courts in Florida didn't respect the stay

12  order, most courts around the country did.  And we would ask

13  Your Honor to do that, to compel the Trustee to seek leave of

14  the Receivership court before coming here.

15        THE COURT:  Okay.

16        MS. REDMOND:  Thank you.

17        THE COURT:  Thank you.  You've got about a minute

18  left.  Mr. Berman?

19        MR. BERMAN:  Your Honor, briefly on the motion

20  to dismiss, Barton and the Barton doctrine is designed to

21  prevent suits against a Receiver, and has been extended to

22  Trustees, for their conduct in operating a business, in

23  pursuing claims, in committing breaches of fiduciary duty

24  It's an attack on the Receiver or an attack on the Trustee.

25  We've attacked neither in this case.

1          The District Court decision, there was a claim in

2     that District Court litigation for malpractice against one of

3     the Receiver's lawyers but that's not what we're talking

4     about here.  We filed a claim against Trans Healthcare, Inc.,

5     who's a claimant in this case.  Trans Healthcare, Inc. filed

6     a proof of claim in this case.  We objected to that claim and

7     filed a count for declaratory relief.  So it is the entity,

8     and not the Receiver, who is the Defendant in our adversary

9     proceeding.

10          Barton is not designed to protect claims against

11     that company.  You could, if you choose to exercise your

12     comity rights, choose to stay that claim, but we're talking

13     about a Maryland state court Receivership that has no --

14     has not exercised any jurisdiction over Florida properties.

15     There aren't any Florida properties.

16          And for purposes of summary judgment today, we are

17     not seeking a substantive determination on what the contract

18     says, and I will not prosecute the motion for summary

19     judgment to obtain a judgment for damages.  I'm simply

20     seeking a declaration on the judicial admissions and judicial

21     estoppel positions.

22          Quite simply, the THI entity, both pre-Receivership

23     and post-Receivership, has taken the position that they have

24     both a duty to defend and a duty to indemnify pursuant to the

25     stock purchase agreement.

1          As you pointed out in <u>Digital Community Networks</u>

2     at 496 B.R. 243 and in particular page 250, the purposes

3     of judicial estoppel are to protect the integrity of the

4     judicial process by prohibiting parties from deliberately

5     changing positions according to the exigencies of the moment.

6     That's what we're talking about here.  And you cite <u>New</u>

7     <u>Hampshire v. Maine</u>, a Supreme Court case from 2001.

8          And the Eleventh Circuit has developed its own

9     judicial estoppel test in the <u>Burnes v. Pemco Aeroplex</u> case

10    at 291 F.3d 1282, and in particular 1285.  First, we have to

11    show that the allegedly inconsistent positions were made

12    under oath at a prior proceeding and that the inconsistencies

13    were calculated to make a mockery of the judicial system.

14          The idea is to prevent parties from playing fast

15    and loose, and we obviously assert that the statements that

16    were made were statements made under oath or representations

17    by counsel.  And I understand there's a difference of opinion

18    as to whether pleadings constitute the types of statements to

19    which judicial estoppel should apply.

20          Let me walk you through the facts quickly.  Since

21    2006, THI has unquestionably undertaken the defense of THMI

22    in lawsuits all over the country and has directed that

23    litigation.  The THI lawyers have hired state court lawyers.

24    And that existed up until the Receivership in 2009 and then

25    conduct continued.

1          The Receiver hired law firms to defend those state

2     court cases whether they were cases in which the claimants

3     filed proofs of claim in the Receivership or not.  In fact,

4     all but one of the Wilkes claimants chose not to file a claim

5     in the Receivership case.

6          But the entity, Trans Healthcare, Inc., had a duty,

7     according to Trans Healthcare, Inc., before and after the

8     Receivership to both defend and to indemnify.  You even said,

9     in Docket 920 at page 9, in your memorandum opinion on motion

10    for reconsideration -- you said, "There can be no serious

11    argument that THI and the THI Receiver believed they were

12    bound by the indemnification agreement until very recently."

13         You said, "What is the explanation for the repeated

14    references by THI and the THI Receiver as well as the Debtor

15    and Fundamental Administrative Services to THI's obligations

16    under the indemnification agreement when seeking affirmative

17    relief from the various state courts in the wrongful death

18    cases, and this Court during the pendency of this bankruptcy

19    case."

20         THI and all of the other parties on the other

21    side of the courtroom consistently took the position -- in

22    Nunziata, in Webb, in Jackson, any of the state court cases

23    and here, until you said that THMI's control rested with the

24    Trustee.  Up until that point, they took the position it was

25    their burden, their obligation; they couldn't understand why

1  we would turn down a free defense.  They wanted to defend

2  pursuant to their contractual obligations.

3          Where else have they said those things?  Well,

4  they said them in the Nunziata case, July 21, 2009.  These

5  are just examples.  The Quintairos law firm said, "Trans

6  Health Management is defended in the present action pursuant

7  to an indemnification agreement between it and THI dating

8  back to a time when Trans Health Management was a wholly-

9  owned subsidiary of THI."

10          In September of 2009, September 15th, at the

11  hearing on the motion to stay Mr. Ferrara from the Quintairos

12  firm said, "THMI is being defended in this case pursuant to

13  an indemnification agreement with THI."

14          On January 6, 2012, in Nunziata, Marsha Rydberg

15  filed a motion to vacate the order setting trial and to set

16  aside a default judgment.  And she stood up as counsel for

17  THI and said, "THMI is bringing the motion by and through

18  its indemnitor, the Receiver for Trans Healthcare, Inc."

19          Ms. Rydberg's motion also said, "Pursuant to an

20  indemnity obligation, THI was required to provide a defense

21  for its former subsidiary, THMI, in lawsuits for negligence,

22  wrongful death and related tort claims in a number of estates

23  including the estate of Elvira Nunziata in this case.  As

24  indemnitor, THI provided THMI with a defense of this case

25  before THI was placed into Receivership."

1           She went on to say, "After the inception of the

2    Receivership proceeding, the Receiver assumed the obligation

3    of defending THI to ensure that no THMI obligation might, by

4    default, exhaust the limited assets of the THI Receivership."

5           THE COURT:  Those were the statements made in the

6    Nunziata case, right?

7           MR. BERMAN:  Yes.  Yes, Your Honor.

8           THE COURT:  And I realize -- and there's a

9    distinction that they've made on that -- but there are a

10   number of statements, and I think they're at paragraph 43 of

11   the same document you're reading from, where the statements

12   were made in this case.

13          MR. BERMAN:  Yes, Your Honor.  That's my point.

14   They've been made in Nunziata, they've been made in Webb.

15   I could give you citations to the statements.

16          THE COURT:  No, I just don't need you to repeat

17   all -- I mean, I'm very aware of those statements, and

18   statements of counsel.  I thought that was a pretty good case

19   that was cited, Footnote 12, I believe, that discusses this

20   issue.  But I've got your point.

21          MR. BERMAN:  Fair enough, Your Honor.  The

22   Receiver, through THI, has taken positions in this court --

23   and THI has taken positions, whether in this court, before

24   the Receivership in other courts, and certainly after the

25   Receivership in this court -- it's THI as an entity that has

1   a legal obligation.

2          The fact that there is a Receivership proceeding

3   pending in Maryland doesn't change the fact that THI has both

4   pre and post-Receivership obligations.  And the claim that is

5   being pursued by the bankruptcy estate in this case is an

6   asset of this estate.  And you certainly have jurisdiction

7   over that.

8          If you determine, as I'm asking you to today, to

9   decide that THI is estopped from denying their indemnity and

10  duty to defend obligations, you can make that declaration,

11  you can hold off on a determination of damages as to what

12  damages flow from that determination for an evidentiary

13  hearing, and what the estate -- what this bankruptcy estate

14  does with that determination on both the declaration and the

15  damages that flow in the Maryland Receivership court is up to

16  this estate.

17         We have not filed a proof of claim in the Maryland

18  Receivership case because we think it's premature until this

19  Court decides the merits of its rights against THI.  This

20  Court is not constrained, nor is the Trustee in this case

21  constrained, from determining the contractual entitlements

22  against THI simply because there is a state court

23  Receivership case pending in Maryland.

24         Your Honor, I think on those limited areas, you can

25  make a declaration.  I think that clearly there have been

1    differing positions taken in this court before you on whether

2    or not there is an indemnity obligation, a duty to defend.

3    And when the tables were turned and it was the Trustee who

4    was in control of the defense, and had the authority to

5    select counsel, and requested that THI allow her to hire

6    counsel and fund counsel of her choice, that they said, "Oh,

7    no, there's no indemnification obligation, we were just

8    defending on a course of conduct," which was sort of argument

9    number two after October 9, 2012.

10            For those reasons, Your Honor, we would ask that

11   you grant summary judgment on the limited basis that THI is

12   estopped from denying the existence of a duty to defend an

13   indemnification obligation and set an appropriate evidentiary

14   presentation either consistent with the current trial

15   schedule or in a separate trial, since this is a separate,

16   a nonconsolidated adversary proceeding, on what the damages

17   are that flow from that.

18            I don't think we have to get into the contractual

19   terms of indemnity, although that would be an interesting

20   discussion.  I think that the THI entity can longer deny the

21   existence of the duty to defend and duty to indemnify, Your

22   Honor.

23            THE COURT:  Okay.  Thank you.

24            MR. BERMAN:  Thank you.

25            THE COURT:  Ms. Redmond, you may wrap things up.

1    You've got a minute.

2         MS. REDMOND:  Yes, Your Honor.  Very quickly.

3    I think I have two minutes left.

4         THE COURT:  Oh, you saved it.

5         MS. REDMOND:  Your Honor, the Trustee talks about

6    operating a business.  Well, of course, that's carved out

7    from Barton under Section 959 of Title 28.  That specifically

8    takes out any obligation -- any activities that the Trustee

9    does in conducting a business, but otherwise Barton applies.

10        Barton applies to this case because the Trustee is

11   seeking to access assets of the Receivership estate.  And out

12   of respect for that court and by virtue of Supreme Court

13   precedent, leave of that court must be obtained before the

14   Trustee does that.

15        Since the Trustee isn't looking to liquidate a

16   claim right now, there should be no harm to the Trustee to go

17   through the process correctly, as the Trustee had already

18   proceeded with it, to get leave of that court.

19        In addition to that, when the Trustee says

20   determine a claim now and then we'll find out if it's timely,

21   that seems to be backwards.  You would normally find out if

22   you have a timely claim before going through the exercise,

23   cost and expense of liquidating that claim.

24        At the same time, if the Trustee seeks leave of the

25   court to come back here and reach that determination, the

1  Trustee could seek the allowance of a timely claim when and

2  if the Trustee is able to prove up a claim, which seems to be

3  putting the horse before the cart.

4        Your Honor, the case cited to you by the Trustee,

5  Burnes v. Pemco from the Eleventh Circuit, set the standard:

6  "Under oath" and "calculated to make a mockery out of the

7  justice system."

8        Both of those things -- neither of those things are

9  alleged in the Trustee's complaint.  The complaint fails and

10  must be dismissed, because it doesn't say the statements were

11  under oath and it doesn't say anything about the state of

12  mind, that it was calculated to make a mockery of the justice

13  system.

14        And lastly, Your Honor, Ms. Rydberg appeared before

15  courts outside of this court and said there was a duty to

16  defend and she was denied the ability to appear for THMI.

17  Ms. Sandridge appeared and said there was a duty to defend

18  and she was denied.  There was no success that was obtained

19  by any of the lawyers in this case.  And in fact, in this

20  court, Your Honor did not determine that the Receiver had the

21  ability to represent THMI, but rather that the Trustee had

22  the ability to represent THMI.

23        And, Your Honor, lastly in this case, after 2012

24  when the bankruptcy was filed, it was subsequent to the

25  January 2012 agreement.  And after that agreement, that

1    agreement had that the duties of the Receiver included the

2    duty to defend THMI.  So that was another agreement.  And

3    when you talk about a duty, it's got to be clear that it

4    was in the stock purchase agreement.

5          Many of the people talking -- I know me,

6    specifically, because I read the stock purchase agreement

7    and wasn't comfortable saying that it applied -- my

8    statements with respect to duty to defend referred

9    to the 2012 agreement.  Thank you.

10          THE COURT:  Okay, well, thank you.  Very well, the

11   Court has before it a motion for partial summary judgment

12   filed by the Trustee with respect to an action brought by the

13   Trustee to seek a determination, among other things, that

14   Trans Healthcare, Inc., individually and by and through its

15   Receiver, Alan Grochal, are liable under an indemnification

16   provision as set forth in the documents executed as part of a

17   2006 transaction.

18          The thrust of the Trustee's main point is judicial

19   estoppel, and that is that there were repeated assertions

20   in this court and others about the obligation of THI and

21   the Receiver to indemnify parties including THMI.

22          While I understand that argument, and it has

23   appeal, there are some issues there as to whether or not

24   statements made by a lawyer, as opposed to statements made

25   under oath, can give rise to judicial estoppel.  Frankly, the

1   case that I referenced earlier from Judge Gold, I thought was

2   persuasive on that point.

3          What I can't get around, though, every time I think

4   through this case, is the Barton doctrine.  I just can't see

5   a way why it doesn't apply here, and why the Receiver in his

6   capacity -- Mr. Grochal, in his capacity as a Receiver,

7   should have to come to this court to seek a determination or

8   to respond to a request for a determination as to a parties'

9   rights against THMI under this indemnity agreement.

10         And the Barton doctrine is, I think, clearly

11  implicated here.  I think similar to Judge Scriven in a

12  similar instance, that the Barton doctrine is jurisdictional.

13  Not subject matter jurisdiction but jurisdictional as to the

14  person and as to determinations to be made.

15         Just like in the analogous case, when actions were

16  brought in other courts against the Trustee's counsel, here,

17  or THMI for that matter.  I didn't hesitate to enjoin those

18  actions.

19         Now, I do have, you know, just a concern that --

20  while it wasn't argued here today, the Trustee, I believe,

21  has tried to get some relief up in the Receivership court.

22  You know, at some point, somebody's got to address these

23  issues, and the Trustee needs to have a day in court on these

24  indemnification issue.

25         So I would hope that the Trustee could move either

1    for relief from that court to come back to this court, or to

2    set up a procedure in that court to get this determination of

3    whatever the rights are.  That is a concern, because at some

4    point this case needs to be concluded, and we can't be

5    sitting around waiting for years for another court to act.

6           But as is presented here today, I believe this

7    action is barred by the Barton doctrine, and I will grant the

8    motion to dismiss.

9           MR. BERMAN:  Your Honor, may I be heard briefly --

10          THE COURT:  Yes.

11          MR. BERMAN:  -- before you conclude your ruling?

12          THE COURT:  That's fine.

13          MR. BERMAN:  Staying the relief on the declaratory

14   relief count would accomplish the same thing.  And maybe if,

15   in your order on this motion, you could telegraph your desire

16   for the state court in Maryland to make a determination under

17   Barton as to which court is going to address the issues of

18   indemnification, that might be of assistance.

19          By way of background, we did file a request in

20   Maryland --

21          THE COURT:  No, I saw that and --

22          MR. BERMAN:  -- and could not advance the ball as

23   quickly as this Court has addressed it.  I think dismissing

24   the count would set us back inappropriately.  We have the

25   issue that's before the Court.  I won't proceed any further

1    without leave from the other court, but we could use your

2    help in getting the Maryland Receivership court to address

3    that issue.

4          And the other procedural problem is if you dismiss

5    the adversary proceeding, we have an objection to the claim,

6    which is part of this adversary proceeding as well.  We've

7    objected to the Receiver's claim, which they filed in this

8    court.

9          So my only slight twist to your ruling, although

10   I would like it to be the other way, is that you not

11   dismiss the complaint but that you simply stay it pending a

12   determination from the Maryland State court on which court

13   will hear the substantive indemnity issues.

14          MS. REDMOND:  Your Honor, I have an idea.  Perhaps,

15   you know, you could dismiss Count II, which is the count that

16   asks you to determine that Barton doesn't apply, because you

17   have ruled on that.  The second -- the other counts have to

18   do with the indemnification claim, the objection to the claim

19   and the request for turnover of books and records.

20          You could abate those.  Mr. Grochal just told me

21   that, you know, he'll work with the Trustee to get a hearing,

22   but the Maryland court ought to be the one that decides who

23   makes that determination, because it is the court with

24   jurisdiction over the *res*, over the property of the estate,

25   with respect to whether it's this court or that court.

1    I don't think that courts should tell each what to

2    do but Mr. Grochal will work with the Trustee to be able to

3    get this before the Maryland court.

4    MR. BERMAN:  Your Honor, I --

5    THE COURT:  It was -- the substance of what I was

6    trying to accomplish is to get this matter before the

7    Maryland court either to relinquish jurisdiction to this

8    court.  In other words, give permission for this Court to

9    proceed, or to make the decision.

10    I do think, consistent with what I was trying

11    to do, we could go forward and I could simply abate the

12    count against Mr. Grochal seeking the determination of

13    indemnification, pending the filing of a motion and granting

14    it, and then it would come back here.  Or denying that, and

15    then I would expect that that court will do what it does

16    every day and make a decision so --

17    MS. REDMOND:  Your Honor, I think that works.  You

18    know, the only thing that you should dismiss is the count

19    that dealt with the determination of Barton, because you've

20    actually ruled on that --

21    MR. BERMAN:  Your Honor --

22    MS. REDMOND:  -- that Barton does apply.

23    THE COURT:  Hold on.  I will dismiss that count

24    without prejudice to it being reasserted, if there is

25    permission given, unless this causes a statute problem or

1  something of that nature.

2          MR. BERMAN:  Your Honor, may I be heard briefly?

3          THE COURT:  Okay.

4          MR. BERMAN:  There's no count to determine

5  that Barton doesn't apply.  We have -- I can tell you in

6  Docket No. 3 of Adversary 1007, the counts we've sued on:

7  Count I is an objection to Claim No. 8.  Count II is a

8  count for declaratory relief to declare that there is an

9  indemnification duty and a duty to defend.  Count III is for

10 breach of contract for failure to defend.  Count IV is breach

11 of contract for failure to indemnify.  And Count V is a

12 breach of contract count for failure to make records

13 available.

14         THE COURT:  Okay, I got you.

15         MR. BERMAN:  There's no Barton count.

16         MS. REDMOND:  Your Honor, I think that Count II

17 asks the Court to determine that the Barton doctrine does

18 not apply.

19         MR. BERMAN:  Our wherefore clause says that

20 Beth Ann Scharrer, as Chapter 7 Trustee, and Trans Health

21 Management request this Court enter a declaratory judgment

22 determining their indemnification rights under the agreement

23 and for such other and further relief.

24         I think if we got into a tussle over Barton --

25 I mean, that's where this motion to dismiss issue was.  But

1  the relief we're seeking in the complaint is to determine the

2  rights under indemnification and duty to defend, and that

3  goes hand and glove with the breach of contract counts that

4  are out there.

5          So my respectful suggestion is an abatement of

6  Counts II through V -- and we can go forward, I guess, on

7  the objection to claim count, although it's not pressing --

8  and a direction that we file a motion in the state court in

9  Maryland to seek leave to come back here or to have them

10  determine the indemnification issues.

11          THE COURT:  Why don't you all both go back and try

12  to do something jointly.  And if you don't, send me competing

13  orders.  I'm in the position of having to draft on the fly

14  without being able to reflect on the -- you all make good

15  points.

16          The objective here is to get you in front of the

17  state court judge that's handling the Receivership and make

18  that -- and request that judge to make a decision, send it

19  down here, we're happy to do it.  Or, you know, set it down

20  for trial or get a decision going, so that we can get this

21  resolved one way or the other.

22          MS. REDMOND:  Your Honor, we'll endeavor to do

23  that.  I'm sure if we sit down and read the complaint

24  together, we can reach a conclusion on this.

25          THE COURT:  Okay.  And that's my -- what I've ruled

 1   today is that the <u>Barton</u> doctrine applies, and that's --

 2              MS. REDMOND:  Thank you.

 3              THE COURT:  And then we'll -- how we go

 4   procedurally from there to preserve everyone's rights,

 5   we'll need to fine-tune, and we'll leave that up to the

 6   order-drafting.  And if need be, I can make the final

 7   decision on that in chambers, okay?

 8              MS. REDMOND:  Thank you.

 9              MR. BERMAN:  Thank you, Your Honor.  Can we take a

10   brief break --

11              THE COURT:  Yes.

12              MR. BERMAN:  -- before we move forward?

13              THE COURT:  Yes.  We'll take a five-minute break.

14              MR. BERMAN:  Thank you, Your Honor.

15              COURTROOM CLERK:  All rise.

16              (Recess taken from 3:33 to 3:42 p.m.)

17              COURTROOM CLERK:  All rise.  This Honorable Court

18   is again in session.

19              THE COURT:  Please be seated.  And I was reminded

20   that I have a commitment at 4:30, requiring me to get off the

21   bench at 4:20.  I apologize for that.

22              MR. BERMAN:  Your Honor, given that time

23   constraint, I think it's important for us to accomplish a

24   couple of things today.  We have a pending motion -- although

25   not on calendar and you could address this at another time,

1   as long as we can do it soon -- the motion to expand or

2   enlarge the discovery time limitations.

3          That's not on calendar and I was having Mr. Traub

4   pull a copy of it, but it was raised since the discovery

5   cutoff, I think, was on the 14th.  We have agreed --

6          THE COURT:  I think there were just a couple

7   issues.  I did read that when it came in, and I think

8   everyone was on board with extending it except a response,

9   I think, from Ms. Redmond's side of the room was they didn't

10  want to extend written discovery. The cutoff for that was

11  30 days ago and --

12         MR. BERMAN:  There are a couple of distinctions,

13  and some parties wanted to reset the trial dates, and I think

14  it's probably worth a little more airing out if we can get

15  some time quickly on that.  And that's one set of issues.

16         THE COURT:  Okay.

17         MR. BERMAN:  We have the GTCR/Kirkland & Ellis

18  document issues, our motion and their motion.  We have the

19  FAS motion to compel, which is pretty straightforward.  I

20  think the Court is aware of the issues there.  The Christine

21  Zack litigation, and our motion for summary judgment may be

22  one that makes sense to bump a little bit.

23         THE COURT:  Right.

24         MR. BERMAN:  And then we had an issue that arose

25  yesterday in our depositions in Baltimore, which was -- I

```
 1   can explain to you, but it's a question of whether or not we
 2   have additional time to depose witnesses who are the subject
 3   of pending depositions, and I think you can give us some
 4   guidance quickly on that.  I think there was a disagreement
 5   amongst counsel, and I thought it might be appropriate to
 6   raise today.
 7              If we can run through those as quickly as possible,
 8   I think we can probably get through it by your deadline.
 9              THE COURT:  Okay.
10              MR. BRUNNER:  The only thing I'd like to be heard
11   on is -- you know, I certainly will try to accommodate the
12   Court in what ever way possible.  I did make this trip --
13              THE COURT:  Okay, well -
14              MR. BRUNNER:  -- and I'm not here for a lot of the
15   other motions.  And I think that's one that we could get out
16   of the way.
17              THE COURT:  Which one do you want to do?
18              MR. BRUNNER:  Ms. Zack, the motion on summary
19   judgment.  I think it would be good to hear that.  I disagree
20   with my colleague there because, again, I did make the trip
21   here today to be here for that particular motion.
22              THE COURT:  Okay.  And that's a summary judgment in
23   the case I entered a preliminary injunction --
24              MR. BRUNNER:  Correct.
25              THE COURT:  -- based on the Ohio lawsuit.
```

1          MR. BRUNNER:  Correct.

2          THE COURT:  There was a transcript; I saw that.

3   We could do that one, I mean, pretty quick.  I know that that

4   one could be put off but --

5          MR. BERMAN:  But my only concern is I know some of

6   the discovery issues are pretty hot.  I know the Kirkland &

7   Ellis firm feels very strongly about the privilege issues,

8   and there are documents that we need to use in our pending

9   depositions.  We --

10          THE COURT:  Okay, let's talk about when we could

11   come back to resolve this.  And there's a whole bunch -- I've

12   got a whole page of things that, you know, are unresolved

13   that need to be set down.  You all really another -- you need

14   at least half a day to get all the things that are on the

15   table resolved.

16          Why don't we try to get you that day now because

17   you're not going to get half a day done in the next 45

18   minutes.

19          MR. BERMAN:  I understand.

20          THE COURT:  Marti --

21          COURTROOM CLERK:  We have April 3rd.  You can have

22   either the morning or the afternoon.

23          THE COURT:  Okay.

24          COURTROOM CLERK:  And that happens to be open at

25   the moment.

 1          THE COURT:  So we'll just hold that out there

 2    and --

 3          MR. BERMAN:  We have -- and we can split ranks, but

 4    we do have Michael Sandnes' deposition set.  He's appearing

 5    somewhere in the Middle East by video link.  But no day is

 6    going to be good, so you give us what days you have and we'll

 7    deal.

 8          THE COURT:  No, I have a feeling that's going to be

 9    a common problem.

10          MR. BERMAN:  Yeah.  We'll adjust Sandnes.

11          COURTROOM CLERK:  I'm sorry, but we just have -- oh

12    yeah, that's right, never mind.

13          THE COURT:  Okay.  Now, in terms of what needs to

14    be resolved, extending the discovery date is something you

15    need an answer on sooner than later because that's going on.

16    That's a critical thing.

17          The FAS motion to compel, that's, you know -- it

18    needs to be resolved but I don't know that that's a today

19    issue.

20          And then the GTCR, there were some issues of

21    privilege there and who can see what.  I think there's two

22    issues that --

23          MR. BERMAN:  What we've been doing on that, just to

24    bring you up to speed, is if we have questions about one of

25    these documents to which a privilege was asserted, we'll have

1   the witness identify the exhibit and then we put it under

2   seal as part of the deposition record and we're not showing

3   it to any other parties.

4          I'd like it to be resolved, but as a matter of

5   time preference, I actually think the FAS motion is probably

6   the most important because that's holding up Mr. Kapila

7   from going back to FAS to do his investigation and gather

8   information, and we've been trying to do that since December.

9          THE COURT:  Okay, why don't I do this, then.

10  Let's do the Zack motion and the FAS motion.  And then on

11  the extension of the discovery cutoff, if we can get to it

12  today, fine.

13         Otherwise, I'll consider that in chambers and maybe

14  even schedule a hearing at which everyone appears by phone,

15  and I'll just be sitting here by myself and we'll have an

16  actual hearing but -- because that doesn't need, you know,

17  full-blown -- it's just that we can work through any

18  practical issues.

19         And then we'll come back on April 3rd on the GTCR

20  matter.

21         MR. VARNER:  Judge, could I real quick?

22         THE COURT:  Yes.

23         MR. VARNER:  Extending discovery, I think, also

24  involves a time limit for any amendments to the complaint in

25  view of your opinion on the motions to dismiss.  And on

1  behalf of Mr. Schron and the other parties who have been

2  dismissed, when you do consider that, we'd like for you to

3  keep in mind --

4       THE COURT:  Marti, could you hand this out?  This

5  is the order -- and I thank you for remind me.  This is the

6  order which I'd like you to look at.  It's the order on my

7  memorandum opinion dismissing the complaint.  I didn't mean

8  to interrupt you.

9       But if you'd all look at that and give me feedback

10 by tomorrow by email?

11      MR. VARNER:  Judge, we just wanted to ask you to

12 keep in mind, part of the schedule we proposed is intended to

13 give the Court time to rule on -- if they choose to replead

14 against the dismissed parties -- and frankly I don't think

15 that would be prudent -- but if they choose to do that, there

16 will likely be additional motions to dismiss.

17      And the schedule we proposed is intended to give

18 the Court time to rule on those before we have to incur

19 expenses like hiring experts before they've even established

20 they can make --

21      THE COURT:  No, I understand.  We need to get these

22 pleadings closed, and that's why I want to enter that order

23 tomorrow.  If you think -- it's 21 days. If you don't need 21

24 days to replead or to answer -- I had 14 in there originally

25 and I thought, "Well, let's give them 21," but it might make

1   sense to go with 14.

2          MR. BERMAN:  May I consult, Your Honor?

3          THE COURT:  Yes.

4          MR. BERMAN:  Because I think we could probably

5   resolve that issue right now.

6          THE COURT:  Right, okay.

7          (Counsel conferring.)

8          THE COURT:  I'll assume when you get back to

9   your office, you'll check all those paragraphs against my

10  memorandum opinion.  That's why I took a little while to get

11  that out, but the main thing I want to know from you from you

12  is the amount of days that you want --

13         MR. BERMAN:  Your Honor, we --

14         THE COURT:  -- that they want for an amended

15  complaint and you want to answer.

16         UNKNOWN SPEAKER:  Your Honor, we could do it in

17  14 days.

18         THE COURT:  Okay.

19         MR. BERMAN:  If you give us 14 days from today, we

20  can get amended complaints out, and then if you would shorten

21  the time also on answers or motions to dismiss similarly,

22  that'll speed the process along.

23         THE COURT:  Okay.  What about 14 and 14?

24         MR. BALASSA:  Your Honor, we would ask for 21.  The

25  Trustee's already had some time since Your Honor ruled and we

1  don't know what they're going to plead, if there's different

2  theories or facts that we need to address and motions to

3  dismiss, we'd like adequate time to do that.  And 21 --

4  14 and 21 from tomorrow, we believe would allow the Court --

5        THE COURT:  Okay.  Well, they did have a week

6  advantage so that is some parody there.  Okay, that's fine,

7  14 and 21.

8        MR. BALASSA:  Thank you, Judge.

9        MR. BERMAN:  Okay.  Well, we resolved one thing,

10  I guess.

11        THE COURT:  We're making progress.

12        MR. BERMAN:  I can -- I'm happy to reset.  And are

13  we set on the 3rd at a particular time?

14        COURTROOM CLERK:  Judge, do you want to do it in

15  the morning or the afternoon?

16        THE COURT:  Let's do it in the morning.

17        COURTROOM CLERK:  9:30.

18        THE COURT:  What I was thinking is if we do it in

19  the morning, and then there's a possibility we could go over

20  in the afternoon if we had to, because I'd like to -- I'm

21  going to take a look at all the things that are pending --

22  I've got a whole list of them -- and then see if we can just

23  schedule everything for that date and get all this stuff done

24  because there's just so many pieces here.  I really do want

25  to keep that trial date.

1           This case -- nothing good will happen if that trial

2    date gets pushed off for another three or four months.  I

3    don't have two-week blocks sitting around so -- I mean, I

4    might be able to find one by moving things and all that,

5    but I can't guarantee it, so --

6           MR. BERMAN:  Understood, Your Honor.  I can

7    probably get through the motion to compel on FAS quickly,

8    and then deal with the Zack issues.

9           THE COURT:  Well, let's do Zack first.

10          MR. BERMAN:  Your Honor, Mr. Traub is going to

11   argue the Zack issues.

12          THE COURT:  Okay.  Mr. Traub, how much time do you

13   need?

14          MR. TRAUB:  I don't need more than five to ten

15   minutes, I'd say, or eight minutes.

16          THE COURT:  Okay.  Why don't you take seven.  We'll

17   compromise.

18          MR. TRAUB:  Sounds good.

19          THE COURT:  And then Mr. Brunner, I'll give you

20   seven to respond.  I have read that motion and I just really

21   want to get Mr. Brunner's thoughts on it.

22          MR. TRAUB:  Sure, Your Honor, and then I'll just --

23   I can shorten it down to five, then.

24          THE COURT:  Okay.

25          MR. TRAUB:  Our motion really is against both Zack

1    and the other Defendants, FLTCH and FAS.  I think the major

2    relief that's still needed is only against Zack, simply

3    because the relief against FLTCH and FAS, they ended up

4    filing their case in this court, but the case in New York

5    is still pending and we've asked that it be dismissed.  It

6    hasn't been, yet, so technically I think we still need a

7    permanent injunction on those -- against them as well.

8         Against Zack, it's more pressing.  It's a lawsuit

9    against our firm for malicious prosecution.  Your Honor has

10   already entered the preliminary injunction where you found

11   that there was irreparable injury.  The threatened injury to

12   the Trustee and the estate outweighed whatever damages that

13   any injunction would cause Ms. Zack, and that issuing an

14   injunction would benefit the public interest and not be

15   adverse to the public interest.

16        The only outstanding remaining issue, Your Honor,

17   would be the difference between the likelihood of success on

18   the merits for preliminary injunction and actual success on

19   the merits for the permanent injunction.

20        Your Honor, we believe your ruling on the

21   preliminary injunction set the stage for that, and that there

22   would be actual success on the merits for violation of the

23   Barton doctrine pursuing the Trustee's counsel in Ohio.

24        The case in Ohio, while Ms. Zack tries to draft

25   around her suing the Trustee's attorneys by saying it was

1  only in their capacity as attorneys for THMI, every single

2  action we have taken where THMI is a Plaintiff is jointly

3  with the Receiver -- or excuse me, jointly with the Trustee,

4  and it's all been actions that relate to and affect this

5  estate.

6        Even the allegations in Ms. Zack's complaint talk

7  about the items that the Trustee performed in this case,

8  including their request that Ms. Zack produce documents and

9  turn over her litigation files, the Trustee's nine-hour, in

10 quotes, 2004 examination, the motion to compel her to produce

11 documents and compel further testimony.

12       And then, of course, there is the complaint for

13 malpractice and breach of fiduciary duty and complaint for

14 unauthorized practice of law.  Those were the two where the

15 Trustee and THMI were both Plaintiffs.  And then some more

16 discovery in those malpractice and UPL actions.

17       And, Your Honor, in ruling on the preliminary

18 injunction, you had found that Ms. Zack's actions in filing

19 in Ohio were counter-attacks in another jurisdiction against

20 the Trustee after you ruled that she controlled THMI.  You

21 also found that it was a clear violation of the Barton

22 doctrine, that our firm was being sued because they're

23 Trustee's counsel and they took actions that the parties

24 wanted to litigate in another form in the form of a malicious

25 and abusive process action.

1          And you had said, "I don't know anything that could

2   be more within the Barton doctrine," which in summarizing

3   what you said was, "meant to stop someone from suing the

4   Trustee to put the Trustee's counsel in the position of

5   having to defend itself."  And that's exactly what we have

6   here.

7          Ms. Zack has sued the Trustee's counsel in Ohio,

8   which is where our principal -- or originating office is,

9   but not where Mr. Berman and I are obviously located or the

10  Trustee.

11         And, Your Honor, you rejected any argument that

12  somehow there was a distinction between the actions we were

13  taking on behalf of THMI and the actions we were taking on

14  behalf of the estate.

15         Your Honor, the only difference in our motion for

16  permanent injunction is that we've also requested damages in

17  the form of the fees and costs that we incurred in this case.

18  Your Honor, I cited the In re DeLorean Motor Company for

19  the proposition that a Trustee is certainly entitled to the

20  actual damages including costs and attorneys' fees incurred

21  as a result of violations of the Barton doctrine.

22         And on those bases, Your Honor, we would request

23  you grant summary judgment.

24         THE COURT:  Okay, thank you.  Mr. Brunner?

25         MR. BRUNNER:  Thank you, Your Honor.  I need to

1   remind the Court that we're here on a motion for summary

2   judgment.  Under summary judgment, all evidence must be

3   construed in a light most favorable to the non-moving party.

4          And I recall the Court's statements to me when I

5   was in court and you granted that preliminary injunction, you

6   said that I had failed to demonstrate that the Trustee would

7   not be harmed, and that's why you felt in all prudence you

8   were going to grant that particular order.

9          Since that time, different things have happened.

10  And first of all, there was no other evidence presented to

11  this Court than what was presented on the motion for

12  preliminary injunction.  The affidavit is the same.

13  It doesn't present any new evidence.

14         As we pointed out in paragraph 9 of our response,

15  the Trustee cannot demonstrate constitutional standing

16  because she can't show injury to the estate.  She has never

17  demonstrated any need to indemnify or hold harmless or do

18  anything with respect to her counsel, and that's clearly not

19  a usual provision in a contract with counsel that you agree

20  to indemnify your attorney if they are in fact sued.

21         And as we pointed out, Ohio is -- admittedly that's

22  only their principal office.  They have three or four offices

23  in Ohio, so it's not a jurisdiction where the Shumaker firm

24  is being put to a great burden.  They have plenty of assets

25  there, they have assets in the district where they are being

1  sued, they have offices, they have attorneys to represent

2  themselves.

3        That's not a significant burden being put on them,

4  and we've yet to see how the estate has any reason to -- has

5  any duty to somehow defend or hold harmless or to pay any

6  costs associated with this litigation.

7        I mean, the prudential standing prohibition that we

8  mention in paragraph 14 is the litigants can't be raising

9  another person's rights.  And in this case, she's raising the

10  rights of counsel, and is not counsel in the capacity as

11  counsel to the Trustee.

12        Judge Moody dismissed both the underlying -- or

13  both the underlying cases, on which this case was brought,

14  were dismissed against my client on the basis that there was

15  no jurisdiction over my client.

16        As you will recall, the Trustee never came to

17  the -- the Trustee never came to this Court and asked

18  permission to bring these cases.  It was not an action that

19  was brought permissively by this Court.  No permission was

20  sought.  In fact, it was brought -- almost as soon as this

21  case was filed and the Trustee was appointed, these actions

22  were brought against my client.

23        What Judge Moody, in the case before him, indicated

24  was that THMI is bringing this cause of action as a separate

25  Plaintiff, not through Scharrer's authority as Trustee of a

1   parent corporation.  That's at page 6 of his decision and

2   we've attached that to our memorandum contra.

3           It's quite clear that THMI brought this action and

4   that the Shumaker firm was acting in that capacity in suing

5   my client -- and in Florida, where there was no jurisdiction

6   over my client, where the Court's not found purposeful action

7   by my client of doing anything in the State of Florida.

8           Those actions were brought against the Shumaker

9   firm, not in its capacity as counsel for the Trustee, but

10  in its capacity as counsel for THMI.  And what you had

11  differently than what you had before is Judge Moody's finding

12  that in fact THMI did bring the action in its own right.  And

13  therefore, anybody who acted as counsel would be subject to

14  such a claim.

15          It's not a Barton doctrine claim, as you've already

16  ruled earlier this afternoon.  These entities are not

17  substantively consolidated.  They are separate entities.

18  This action is brought only in the capacity as counsel to

19  THMI, which we have Judge Moody's decision now that they are

20  in fact different.

21          The same thing, the Trustee also indicated that she

22  didn't believe the Barton doctrine applied to her because she

23  didn't need to have to get this Court's permission to bring

24  these actions against my client on behalf of THI and attempt

25  to assert jurisdiction over my client in the State of

 1  Florida.

 2          We think all of those militate against the Court

 3  finding this decision on summary judgment.  There's no new

 4  evidence before this Court.  The same affidavit from 2012 is

 5  before this Court and it's not been demonstrated how the

 6  estate will be harmed.  And this Court must construe the

 7  evidence as most strongly against the moving party in these

 8  circumstances.

 9          And finally, there's this claim for damages.  And,

10  again, no evidence of the damages, not even any indication

11  that in any way the estate has any duty to indemnify and hold

12  harmless its counsel.  And for those reasons, we think

13  summary judgment should be denied.

14          THE COURT:  Okay, thank you.  Very well, I'm going

15  to grant summary judgment to the Plaintiff and enter a

16  permanent injunction.  I will not award any damages, and I

17  will explain my ruling in a written decision which goes

18  through that, in the interest of time.  I will address the

19  points that counsel ably made on behalf of Ms. Zack.

20          But at the bottom line of all this, as I said in my

21  oral ruling, is no matter how you dress it up, this was a

22  collateral attack on this Court's jurisdiction and a direct

23  attack on Trustee's counsel, who was operating in his

24  capacity as the Court authorized counsel for the Chapter 7

25  Trustee.  And as such, it did run afoul of the Barton

1   doctrine, and I'll explain that in more detail, but given the

2   circumstances, I will not -- I'll deny the motions as to

3   damages.  And I'll do that order.

4           MR. BERMAN:  Thank you, Your Honor.

5           THE COURT:  Do you want do FAS?

6           MR. BERMAN:  If I can take five minutes?

7           THE COURT:  Okay.

8           MR. BERMAN:  I'll go through it as quickly as

9   possible.

10          THE COURT:  Mr. McCoskey, you're going to be up

11  next.  You're in the batting box.

12          MR. MCCOSKEY:  I'll loosen up.

13          MR. BERMAN:  He's speedy.  I can see how he can

14  move.  We filed, to assist the Court, earlier today a

15  demonstrative aid, did a notice of filing, which is a

16  timeline that we had previously provided to the Court of

17  various discovery requests directed to FAS.  FAS steps in  --

18          THE COURT:  Do you have an extra copy of that?

19          MR. BERMAN:  I can -- may I approach, Your Honor?

20          THE COURT:  You may.

21          MR. BERMAN:  (Presenting document.)

22          THE COURT:  I mean, I realize it's been around for

23  four hours and we should be looking for these things, but --

24          MR. BERMAN:  Mr. Traub prepared me.  This is

25  essentially the timeline that we gave you at the last hearing

1   when we asked you to give us the emergency relief to go into

2   FAS' systems and mirror image copies of the hard drives.

3   This was the broader discovery motion to compel.

4          And so what we did is, in chronological fashion, we

5   laid out quoting particular motions and orders and discovery

6   requests.  And we've also given you the Bates range and the

7   descriptions of the documents.

8          I believe these descriptions -- on pages 4, 5 and 6

9   are the descriptions that FAS used in responding to various

10  motions.  This is our third motion to compel.

11         In sum and substance, we have asked for turnover of

12  property of THMI.  We understand that all of the paper and

13  computer files that were THMI's files stayed at the facility,

14  and THI of Baltimore Management, then Fundamental Clinical

15  Consulting, and then Fundamental Administrative Services has

16  made use of that property.

17         We think it's property of the estate and should

18  have been turned over.  At a minimum, we think this Court has

19  ordered repeatedly communications related to the defense of

20  the state court claims be turned over.

21         And originally, we just asked for communications

22  related to the six Wilkes' litigations.  We've since, in the

23  summer of 2013, asked for all of those communications.  We

24  know they exist.  You, in December, I think, learned that

25  there were documents not turned over, and that's when I

1  suggested Mr. Kapila be given permission to go to Sparks,

2  Maryland and sort of check out the computer records and get

3  whatever he needs, with some broad authority to request

4  things and interview employees.  And you granted us that

5  relief.

6          We had a snowstorm.  I went.  Mr. Kapila couldn't.

7  We did a telephone sort-of setup, and he asked questions.  He

8  was given a run of, I think, accounts payable or the general

9  ledger.  He went through the documents that he was given.  He

10  asked questions of the three people who were presented to

11  him, and Mr. Kapila believes that he needs more information.

12  We've detailed exactly what he's requested.

13          In fact, I encouraged him to just communicate with

14  Mr. McCoskey directly by email copying me on it.  He did

15  that.  He's not received what he wants and what he needs

16  document-wise.  We haven't gotten the very documents that we

17  asked Ms. Zack and Ms. Anderson to produce that you said

18  those communications may not be Ms. Zack and Ms. Anderson's

19  but they're clearly at FAS, so all those communications about

20  how the lawsuits are going to be defended need to be turned

21  over somehow some way.

22          It's been over a year and a half on those

23  documents.  And we fortuitously got copies in some of the

24  production that Ms. Redmond turned over to us because our

25  state court lawyers for THMI had communications from Ms. Zack

1   and Ms. Anderson on the defense of the lawsuits, the very

2   documents that you said should be included in what we get.

3          Haven't gotten it from FAS.  And the response that

4   we got at the last hearing was, "Well, they're doing the best

5   they can to find everything."  That's when you denied our

6   request to sort-of image their computer systems.

7          The fact remains we still don't have those

8   documents.  We've requested a reset date for Mr. Kaila.

9   We still don't have it.  Originally back in December is when

10  you told us Mr. Kapila could go up there, and we're now in

11  mid-March.  And given the scheduling issues we've had in this

12  case, Mr. Kapila getting access to the computer records, and

13  the communications coming to us after discovery is closed is

14  of little benefit.

15         So there is now some time urgency, given the

16  passage of time since the requests have been originally made.

17         THE COURT:  Okay.  Let's hear from Mr. McCoskey.

18  And it may be if we don't finish this today, what I can do is

19  get on the phone with both of you tomorrow.  I could do it in

20  the courtroom, so it'd be a continuation of this hearing.

21  But ultimately what I'm going to be looking for is proposals

22  from both sides as to what you think is reasonable under the

23  circumstances, if I can't get you all to agree to something.

24         MR. BERMAN:  Yes, Your Honor.

25         THE COURT:  Go ahead, Mr. McCoskey.

 1          MR. MCCOSKEY:  Yes, sir.  It sounds like we are not

 2    exactly as far along as I had hoped the last time when I had

 3    asked the Court to please, please, please let us get beyond

 4    turning over THMI's property.  We've been well beyond that

 5    many times over.  What we are talking about now are documents

 6    relating to THMI.

 7          We've been through this exercise, and the Court

 8    ordered and allowed Mr. Kapila's participation.  That was

 9    last fall, late last year.  That was after I had filed

10    Document 1203, Fundamental Administrative Service's

11    Supplemental Response Regarding Document Production.

12          And within that, Your Honor, we described what we

13    have done, what we thought we had responsive that we could

14    get right away.  We did produce a small amount of documents

15    following that.

16          We also, in that, attached two different affidavits

17    of Kristi Anderson that she had executed at various times

18    that describe both the cost and the problems in collecting

19    emails.  So we have that particular problem.  We have Mr.

20    Kapila issues which, as Mr. Berman said, we had scheduled in

21    good faith in January, the weather didn't cooperate.  We had

22    produced to him --

23          THE COURT:  I'm more interested in what are your

24    plans to complete the discovery going forward.  And the hard

25    part I have, of course, is I don't -- you know, I don't know

1    what's out there.  You say there's -- you know, you've

2    complied or you almost have, or you're working on it.

3    You know, what's the next step?

4         MR. MCCOSKEY:  Well, we need to get Mr. Kapila

5    up there, which is fine.  We offered four days in March in

6    good faith.  None of those dates could work, and that's

7    understandable.  We're all on tight schedules.  We offered

8    up next Friday, but Your Honor scheduled another discovery

9    hearing, the Kristi Anderson matter next Friday.

10        There's four days of depositions next week, in

11   Baltimore and Harrisburg.  Then Friday we'll be here on that.

12   The following week on Monday and Tuesday, we'll be in

13   depositions that I'll need to be there.  I will endeavor to

14   go back to my office today and send out open dates in April

15   that we can get him there.

16        I have the email of his additional requests.  I

17   don't necessarily agree that either those documents exist or

18   that they're necessary or otherwise entitled, but Mr. Kapila

19   deserves some response and he'll certainly get a response and

20   get what we have or what we can provide him in advance of a

21   scheduled meeting date.

22        So if Your Honor is asking what's the next step, I

23   think the next step is we finish -- we schedule and finish

24   this issue with Mr. Kapila, we allow him to interview.  I've

25   not received a list, I don't believe, of --

1              THE COURT:  I've got the picture.  What about that,

2    Mr. Berman?  I mean, I hear you and we're really back where

3    we were because of -- unfortunately, because of a storm.

4    And so Mr. -- my view, when we had this original hearing --

5    and original meaning not original, but along the way, where I

6    suggested, "Why don't we have Mr. Kapila go there," was to

7    have Mr. Kapila on the ground being able to interview people

8    in a more informal atmosphere, have the lawyers there, and

9    then he, as a professional in his area, will get a sense and

10   can help the Court and come back and say, you know, "I don't

11   think I saw -- it couldn't have been everything because

12   there's more there and I was denied access."

13             Or he says, "Yeah, we did identify some things," or

14   he says, "Well, I guess they don't have it, but I've talked

15   to everybody I could."  That just hasn't happened, for

16   nobody's fault.

17             MR. BERMAN:  I agree.  And I think there should be

18   a little bit of pressure to get that done soon because

19   there's been bad weather but there's also -- I've been back

20   to Baltimore twice, since that super storm that shut everyone

21   down, for depositions.  We're going back on Monday, as I

22   understand it, for more depositions.  So it's not that the

23   weather is prohibiting him from coming.

24             THE COURT:  I understand.

25             MR. BERMAN:  That's one side of things.  And

 1  I'm fully comfortable with Mr. Kapila handling himself with

 2  his team with FAS staff to request -- either he's going to

 3  come back to you and give you a report that they weren't

 4  cooperative or that they gave him everything that he needed

 5  and he's all set.

 6        The other issues which is independent of Mr. Kapila

 7  are the communications that you've repeatedly ordered be

 8  turned over.  There's no good reason that's ever been given

 9  why those haven't been turned over.

10        We asked Ms. Zack and Ms. Anderson to give us those

11  back in 2012 and we still don't have them, and now we know

12  they exist.  We just don't know how much there is because

13  we've been able to see some of them from third party sources.

14  There's zero reasons why those haven't been turned over.

15        THE COURT:  You're talking about communications

16  between Zack and Anderson and the lawyers out in the field?

17        MR. BERMAN:  In relation to any of the lawsuits

18  where THMI was being defended.

19        MR. MCCOSKEY:  And that issue has been discussed

20  several times, and we've brought it up.  First of all, those

21  communications involve parties on both sides and they've

22  already received those productions.  That is, the Florida

23  lawyers on the ground with FAS as the intermediary, as a

24  litigation liaison to the THI Receiver.

25        The THI Receiver side has fully produced, and has

1  produced a thousand-page privilege log that my client paid

2  for.  On the other side, we've got all of the Florida lawyers

3  who have produced all of those same communications, that is

4  communications relating to -- within Your Honor's prior

5  privilege rulings.  They've produced all those same

6  documents.

7          So we have -- when we provided our response, our

8  supplemental response, we included in that, these affidavits

9  that there is no central email system at FAS to pull this.

10 It will cost -- the estimate is -- Ms. Anderson gave her

11 estimate in two different litigations in excess of $100,000.

12         We also have, Your Honor -- we moved and requested

13 that we be relieved of the obligation of producing another

14 privilege log.  Your Honor ruled against us.  As I said, out

15 of necessity, last time, we took that up on appeal.  That's

16 another issue that--

17         THE COURT:  It's not been stayed pending appeal.

18         MR. MCCOSKEY:  Understood.  We filed a --

19         MR. BERMAN:  And we still don't have that privilege

20 log.

21         MR. MCCOSKEY:  We have filed a motion for stay

22 pending appeal.  That's not been set for hearing.  We're

23 going to certainly make that request of the Court.  We

24 already have.  Nevertheless, Your Honor, what we're talking

25 about --

1           THE COURT:  Well, that would be to this Court

2    first.

3           MR. MCCOSKEY:  Yes, sir.

4           THE COURT:  And when did you file that?

5           MR. MCCOSKEY:  We filed that weeks ago and directed

6    it to this Court.

7           THE COURT:  Okay.  Marti, remind me to check on

8    that.  Okay.

9           MR. MCCOSKEY:  So my point, Your Honor, is that

10   simply saying we know that Ms. Zack and Ms. Anderson had used

11   email, well, we knew that and we've always known that.  We're

12   going to have a process in the next week -- next Friday,

13   we'll have a process.

14           Mr. Berman says that some of these documents that

15   Ms. Anderson took with here when she left the employment, he

16   wants and has asked the Court to deposit all of those records

17   into the Court.  We are supposed to get our copy on Friday.

18   We're already considering --

19           THE COURT:  Oh, that's right, we're going to be

20   here next Friday on the --

21           MR. MCCOSKEY:  Yes.

22           THE COURT:  -- on my deposition of --

23           MR. MCCOSKEY:  And so that process, Your Honor,

24   there are 4,000 pages -- more than 4,000 pages, we now know,

25   that Ms. Anderson took from FAS when she left.  So of those

1    pages, what I have proposed to do, and what I have asked one

2    of my younger colleagues to do is to take what documents we

3    know she has -- we don't know the whole universe, and we

4    expect to get those this Friday.

5            But the ones that we do know, we want to put

6    them in separate buckets.  One bucket will be purely

7    internal communications within FAS.  One bucket will be

8    purely communications between FAS and the THI Receiver.

9    Another bucket will be these external communications or

10   communications in buckets one or two which could not

11   conceivably be privileged because of the subject matter.

12           What I would like to do when we come in is explain

13   to the Court these Bates ranges of documents we believe can

14   and should be produced.

15           THE COURT:  Okay.

16           MR. MCCOSKEY:  That's my hope.

17           THE COURT:  Well, we're going to be back here

18   next Friday on this.  It's not going to be a hearing in which

19   Mr. Berman is going to be here, if I recall this hearing.

20           MR. MCCOSKEY:  Correct.

21           THE COURT:  And we also have a hearing coming up on

22   April 4th (sic-3rd).

23           MR. BERMAN:  April 3rd, I think.

24           THE COURT:  April 3rd, thank you.  We'll continue

25   this motion to April 3rd.  That will allow two things to

1  happen.  One is next Friday's hearing, which will help me see

2  a little bit behind the opaque glass.  And secondly, we have

3  Mr. Kapila's trip, which you all should continue to work to

4  set that up so that can be in place and we can move this

5  process forward.

6           MR. BERMAN:  Would you give us --

7           MR. MCCOSKEY:  We will certainly have that

8  scheduled by that date.

9           MR. BERMAN:  Would you give us a deadline to have

10 Mr. Kapila go up there?  Because scheduling has been very

11 extraordinarily difficult in this case.

12          THE COURT:  Let's say by April 15th.

13          MR. BERMAN:  Thank you, Your Honor.

14          THE COURT:  So that puts pressure on everybody, I

15 realize, including Mr. Kapila.

16          MR. MCCOSKEY:  Well, and it will certainly cause us

17 all to look at the deposition scheduling when we get there.

18 I don't know where we are with that.  It does require that I

19 am present for this.  Given the way the last one went, I'll

20 need to be there, so hopefully we'll be able to address that.

21          MR. BERMAN:  Your Honor, the other issue that's

22 still outstanding -- I mean, I guess we can deal with it on

23 April 3rd.  There's an outstanding privilege log obligation

24 for FAS to give us --

25          THE COURT:  I need to address the motion for stay

1  pending appeal, and I can do that in that context.

2            MR. BERMAN:  Okay.  Thank you, Your Honor.

3            MR. MCCOSKEY:  Thank you.

4            THE COURT:  Okay.  I'm sorry to cut things off

5  about 25 minutes early, but I think we got a lot done.  I'll

6  see you back here shortly.

7            MS. REDMOND:  Thank you, Your Honor.

8            THE COURT:  Court will be in recess.

9            COURTROOM CLERK:  All rise.

10            (Proceedings concluded at 4:18 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I certify that the foregoing is the official verbatim transcript prepared on an expedited basis to the best of my ability from the logs and digitally-recorded audio proceedings of the above-entitled matter.

_____          March 22, 2014
Cheryl Culver (CER, CCR)                    Date
Transcriber

I certify that the foregoing is a federally certified transcript authenticated by:

_____
Kimberley S. Johnson (CVR-M)
Certified Verbatim Reporter Master

JOHNSON TRANSCRIPTION SERVICE
7702 Lake Cypress Drive
Odessa, Florida 33556
813-920-1466
kgjjts@aol.com